## SARAH A. HICKLING *et al.*

*v.*

## ROBERT WILSON *et al.*

*Filed at Ottawa June 21, 1882—Rehearing denied September Term, 1882.*

1. CHANCERY—*joinder of parties—when several creditors may join in one suit.* Two or more creditors of an insolvent corporation, after having recovered judgments for their several demands, and the return of executions issued thereon *nulla bona*, may unite in filing a creditors' bill against the corporation and its stockholders to reach unpaid subscriptions to the company, and such bill is not multifarious, as in such case there is an identity of interest in the question involved and in the relief sought, and the separate injury sustained by each complainant is produced by the same cause or wrongful acts, and also because it prevents multiplicity of suits, which is of itself a distinct source of equity jurisdiction.

2. SUBSCRIPTION—*not defeated as to third persons by any conditions not in written contract.* The legal effect of subscriptions to the capital stock of a private joint stock company, which are absolute and unconditional on their face, can not be qualified or limited by any general understanding among the subscribers that the same should be abandoned and not collected unless a given amount was subscribed, as against creditors of the company, for debts incurred after a permanent organization of the corporation by the election of directors, and engaging in the enterprise contemplated by the charter and organization.

3. SAME—*when stockholders are estopped to deny validity of their subscriptions.* Where subscribers to the stock of a private corporation meet, and elect a board of directors, and thereby effect a permanent organization, and engage in the corporate enterprise for several years, by which debts are incurred, voting and acting as *bona fide* subscribers, they will not be allowed to dispute the binding effect of their subscriptions, or the legality of the organization of the corporation as against third persons who give credit to

the company on the faith of its being legally organized, but will be required to pay their subscriptions as to creditors who are entitled in equity to be subrogated to the rights of the company.

4.  CREDITOR'S BILL—*may reach proceeds of donation to corporation in hands of subscribers.* Where a private corporation was organized to build dams across the Illinois and Fox rivers, for manufacturing purposes, and the city of Ottawa made a donation of $60,000 in its bonds, to be applied in building such dams, delivering the same to one of the corporators on his personal obligation to make the improvement or return the bonds or their value, and he turned the same over to the company, which was to indemnify him against his liability to the city, and such bonds were used as intended, and the dams completed so as to relieve the corporator from his personal obligation to the city, and the company then issued stock to the several subscribers in respect of such donation, for which they paid nothing, some of which stock they sold and converted into money: *Held,* that the money and stock so received by the subscribers could be reached in equity on creditor's bill, and applied to the payment of debts incurred by the corporation in erecting the dams.

5.  SAME—*of the decree against stockholders of insolvent corporation as to unpaid subscriptions.* Where a creditor of an insolvent private corporation has exhausted his remedy at law against the company for labor and materials, he will be entitled in equity to be subrogated to its rights against its debtors, as subscribers for unpaid subscriptions, and in such case it is no error to find the amount due the company from a subscriber, and award an execution against him for the amount so found. It is not necessary to make an apportionment of the *pro rata* share of each subscriber necessary to discharge the company's indebtedness to such creditor. The creditor stands in the same position as would the company if suing for the subscriptions.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of La Salle county; the Hon. JOSIAH McROBERTS, Judge, presiding.

It appears from the record in this case, that at the January term, 1875, of the La Salle circuit court, Robert Wilson and William F. Whetmore severally recovered judgments against the Ottawa Manufacturing Company, the former for $888.40, the latter for $622.57; that executions having been sued out on said judgments, and returned *nulla bona,* the plaintiffs therein, on the 29th day of September, 1875, filed in said court a creditor's bill against the company and cer-

tain other parties, including the appellants, alleged to be stockholders of, and indebted to, the company on account of unpaid subscriptions to its capital stock, and of moneys and effects in their hands belonging to the company, which the complainants seek by their bill to subject to the payment of their judgments; that the company was incorporated under a special act of the legislature, approved February 15, 1851, and an act amendatory thereof, approved February 16, 1865, authorizing the company to construct dams across the Illinois and Fox rivers, in or near the city of Ottawa, in the county of La Salle, for manufacturing purposes; that the company, during the year 1866, was duly organized by the election of officers and a board of directors, who caused books of subscription to its capital stock to be opened, as provided by its charter; that William H. W. Cushman subscribed one hundred shares, of $100 each, to the capital stock of the company, John V. A. Hoes ten shares, Lorenzo Leland ten shares, William Hickling twenty shares, Alexander M. Brown fifty shares, Charles Delano five shares, and Charles H. Force five shares; that these were all the subscriptions ever made; that no part of them has ever been paid, except one per cent thereof, which was paid by the subscribers, respectively, about the time the subscriptions were made; that these several subscriptions, less the one per cent paid, are still due the company from the subscribers, respectively, or their legal representatives, except the subscription of Brown, which, by reason of certain conditions annexed to it, never became binding upon him; that the city council of the city of Ottawa, having the requisite power for that purpose, on or about the 15th of June, 1869, issued in the name of the city $60,000 in bonds, which were delivered to the said William H. W. Cushman, to be by him expended in the improvement of the water power afforded by the Illinois and Fox rivers, by building dams across the same, the city taking from him at the time an indemnity contract, by which he bound himself to either

construct the dams within a reasonable time, or refund the bonds or their proceeds, or otherwise save and keep the city harmless with respect to their issue; that Cushman, on or about the 2d of February, 1871, with the assent of the city, delivered the bonds in question to the Ottawa Manufacturing Company, and the company thereupon entered into a bond, by which it assumed the performance of Cushman's contract with the city; that upon the delivery of these bonds to the company, or shortly thereafter, the directors of the company issued stock representing the same, to the following named persons, namely: to Cushman $16,000, Hoes $14,000, Cameron $9000, Leland $9000, Force $5000, Easton $4000, and Nash, $4000; that the issuing of the stock last above mentioned was in fraud of the creditors of the company; that the company built the dams in question, using only the proceeds of the city bonds for that purpose; that the judgments of appellees were obtained on account of work and labor done by them for the company in constructing said dams; that after the construction of said dams, in 1872, Hoes, Leland, Cameron, Nash and Easton sold their part of the stock so fraudulently issued, as above stated, at twenty-five per cent of its face value, and received payment therefor in money or its equivalent; that Cushman, Easton and Force are insolvent; that there is due the company, on account of the proceeds of their respective shares of the stock received by Hoes, Leland and Cameron, last above mentioned, the following additional sums of money, namely: from Hoes $3500, from Leland $2250, and from Cameron $2250; that there is also due said company on same account, from Nash and Easton, respectively, the sum of $1000.

The circuit court, upon this state of facts, decreed that the complainants were entitled to have their respective judgments paid out of the said several sums of money so found to be due from the defendants to the company, on either of the accounts above mentioned, and ordered the parties,

respectively, to pay the same within thirty days, and that in default of such payment the clerk of the court was required to issue separate executions against each of the defendants liable in his own right for the amount due from him to the company, and such of the defendants as were found liable in their representative capacity were directed to pay the several amounts due from them, respectively, in due course of administration.

Mr. E. F. BULL, for part of the plaintiffs in error.

Messrs. LELAND & GILBERT, also for the plaintiffs in error.

Mr. G. S. ELDREDGE, and Mr. J. B. RICE, for the defendants in error.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

The decree in this case, so far as it relates to the parties now before the court, was affirmed by the Appellate Court for the Second District, and a reversal of the judgment of that court is earnestly urged on several grounds. First, it is insisted there is no community of interest between the complainants with respect to the claims sought to be enforced by the bill,—that they are totally distinct, having no connection whatever with each other. Hence it is claimed the bill is multifarious, and that the circuit court should have sustained the objection taken to it on that ground, and that its failure to do so was error. This objection is not tenable. We understand the doctrine to be well settled that two or more judgment creditors may join in a bill of this character. In such cases there is an identity of interest in the question involved and in the relief sought, and the separate injury sustained by each complainant is produced by the same cause or wrongful acts. Moreover, the direct effect of joining several creditors in one bill is to prevent a multiplicity of

suits, which of itself is a distinct source of equity jurisdiction. These several elements appearing in the case, we are of opinion they are sufficient to sustain the jurisdiction. 1 Pomeroy's Equity Jurisprudence, sec. 269.

The objection which seems to be entitled to the most consideration, and which is urged with the greatest pertinacity, is, that the evidence does not, in several respects, warrant the decree. First, it is claimed there was never any valid organization of the company until after Cushman's contract with the city to build the dams,—that the subscriptions prior to that time were, to use counsel's own terms, mere experimental subscriptions, which were intended at the time to be abandoned if a satisfactory amount should not be subscribed, and were, in fact, subsequently so abandoned. And it must be confessed the testimony of Leland and others would, if there was no other evidence bearing on the subject, give color to this view, yet we do not think, when their testimony is considered in connection with other uncontroverted facts in the case, it sustains it, but on the contrary, when thus considered, it rather strengthens the opposite conclusion. The decided weight of testimony shows that after the temporary organization of the company in April, 1866, a subscription book was provided and subscriptions made in it by Leland, and others specified in the decree. By way of impeaching these subscriptions, Leland testifies as follows: "So far as I know all the subscriptions obtained in the spring of 1866 were abandoned, and the parties never afterwards recognized or called upon as stockholders. It was generally understood that unless a certain amount was subscribed we would not go on, and the amount was never made up. Afterwards Cushman made a contract with the city to build the dam, and he proposed to reorganize the company. I don't think there was anything said about the old company, and thereupon we organized a new company under the old charter, and ignored all except those Cushman designated. There

were a great many that were not asked to come into the new company, and never did come into it."

It will be observed, in the first place, that the fact that the subscriptions were made is not denied by Leland, but, on the contrary, it is distinctly admitted, and while he claims there was an understanding—and this we do not question—that if a satisfactory amount was not obtained the subscriptions were to be abandoned, there is no pretense or claim that any such condition was annexed to the subscriptions themselves, and it is clear the legal effect of those subscriptions, as to third parties, could not be qualified or limited by any general understanding between the subscribers. The form of the subscriptions, as set out in the record, shows they were absolute and unconditional. It also appears, from the records of the company, the subscribers, so far from abandoning their subscriptions, as is claimed, on the 20th of August, 1867, held a formal meeting, at which a permanent organization was effected, by the election of a board of directors, and by re-adopting existing by-laws. The introductory part of the minutes of the meeting is as follows: "Pursuant to a call published in the Ottawa papers, *the subscribers to the capital stock* of the Ottawa Manufacturing Company met at the office of the company, in Ottawa. Present, W. H. W. Cushman, L. Leland, J. V. A. Hoes, D. F. Cameron, W. S. Easton, and Charles H. Force." On motion, all of the above named persons, together with J. F. Nash, were elected a board of directors of the company. On the same day, at a called meeting of the board of directors so elected, a resolution was adopted by the board directing the secretary to notify the commissioners of the city the "company *was organized,* and prepared to receive the city's subscription," etc. Subsequently, and before the supposed reörganization in 1871, the company, by resolution, adopted a seal, with the words, *"Organized in 1867,"* upon its face. In addition to this, there is nothing to be found in the proceedings of the company, from the time

of its permanent organization in 1867, down to the time of the trial, showing a reörganization of the company, or even an attempted abandonment of the subscriptions to the capital stock of the company; but on the contrary, the record of those proceedings clearly and beyond all reasonable doubt establishes the contrary.

It is highly probable that some of the subscribers, after the handsome donation of $60,000 on the part of the city towards the enterprise, concluded they would never be called upon for their subscriptions, and this was probably talked round among them to such an extent as to give color to the hypothesis the subscriptions had been abandoned, but nothing more. That this view was not general among the subscribers, is clearly shown by the fact that several of them have declined to testify on the subject. But even if all had shared in a general understanding of the kind, it would not at all affect or change their liability on their subscriptions. Moreover, if these were not valid and binding subscriptions, the present case furnishes the very remarkable instance of a private joint stock corporation effecting a permanent organization of the company, and successfully carrying on its corporate business for a number of years, without a single dollar of its capital stock having ever been subscribed; for since the evidence clearly shows these were the only subscriptions ever made, it follows, if they were invalid, in contemplation of law no stock was ever subscribed. As none but subscribers to the stock were authorized to permanently organize the company, it follows, if the position of appellants is correct, there never has been any valid organization of the company. In the light of the facts before us, we can not for a moment sanction this view of the matter. The very parties who claim these subscriptions were abandoned, were active participants in the management of the company's affairs for a number of years, attending its business meetings and voting upon all questions affecting its interests. If they were not

*bona fide* subscribers to the company's stock, by what right did they vote and participate in the management of the company's affairs?

It is also insisted that the $60,000 in bonds, given by the city to Cushman, belonged to Cushman, subject only to his personal contract with the city to either make the improvements in question, or, in case of failure, to indemnify the city, and that he therefore had a right to make any disposition of the bonds he pleased; and having used them in the purchase of an equal amount of the company's stock, and having divided it in the manner he did, no one has a right to complain or call on those receiving it to account for the proceeds. This view of the transaction is so palpably unreasonable and inconsistent with the admitted facts, as not to merit serious consideration. It certainly never was intended by the city to donate these bonds to Cushman. They were clearly given to him to be expended, as they subsequently were, by the company in building the dams across the two rivers. His liability, under his contract with the city on account of the bonds, was merely contingent, and absolutely ceased when the bonds were thus used and the dams completed. Cushman turned over the bonds to the company, to be used in the manner they were, in consideration that the company would indemnify him against all liability on account of his contract with the city, which the company did. If the $60,000 in bonds was simply given in exchange for a like amount of stock, the bonds then ought to, and would, have belonged absolutely to the company, to be used in any manner it might think proper, for upon that hypothesis they were paid for by the stock. Yet the company was required, as we have just seen, to expend them in the building of the dams, and also to release Cushman from all liability on account of them. The actual transaction between the parties, when relieved of the little mist which the argument of counsel throws around it, is simply this: The city of Ottawa made

a donation of $60,000 in bonds, to be applied in building dams across the Illinois and Fox rivers, and these dams were built by the company and the funds faithfully applied to that purpose, and Cushman and his confederates have received the value of the bonds in the company's stock, for which they have never paid a single cent—some of which they have sold and converted into money, which they are now called upon to apply in the discharge of appellees' claims against the company for labor and services performed by them in the building of said dams. This is all there is of it, and justice and equity alike say the money thus received should be so applied.

The remaining objection to the decree which we deem necessary to notice, is, that it is erroneous in awarding executions for its enforcement. It is said the court having all the parties before it should have made an equitable disposition of the case, and not have left it so that the whole claim might be collected from one and nothing from the others. We do not understand the law required the court to marshal the assets of the company in the hands of the defendants, and apportion the amount of appellees' claims among them. This is not the ordinary case of several persons being called on to pay a common indebtedness for which all are jointly and severally liable, whence a court of equity will apportion the burden equally between them, but it is the case of several debtors owing distinct and independent claims to a common creditor, where each, in equity and good conscience, is bound for the full amount of his own claim, and where neither is required to pay anything more than what he owes himself. The complainants having exhausted their remedy at law against the company, are in equity subrogated to its rights against its debtors, and the present proceeding is in the nature of an equitable attachment, by which such claims of the company may be made available in the payment of its own debts. If the company

was now suing one of these defendants for the amount of the claim against him, it would clearly be no defence to show it had failed to collect a similar claim against one of the others; and if all were proceeded against and judgments recovered, executions might be sued out against all at the same time, or only against one or any number less than all, as the company might think proper, and the adoption of either course suggested would afford no ground for complaint; and as appellees are subrogated to the company's rights in this respect, and they are by means of the decree in question doing nothing which the company might not rightfully do in its own name, we perceive no just ground of complaint. No defendant under the decree will in any event be required to pay more than he justly owes, and this is not only legal, but just and equitable. Moreover, the decree in this respect is fully sustained by the authorities. *Hatch* v. *Dana*, 101 U. S. 205.

The judgment will be affirmed.

*Judgment affirmed.*