ZURICH INSURANCE COMPANY, Plaintiff-Appellee, v. RAYMARK IN-DUSTRIES, INC., *et al.*, Defendants-Appellees (Northbrook Excess and Surplus Insurance Company, Intervening Plaintiff-Appellee; Federal Insurance Company, Defendant-Appellant).

First District (1st Division)   Nos. 84—1548, 84—2009 cons.

Opinion filed May 27, 1986.—Rehearing denied July 1, 1986.

Peterson, Ross, Schloerb & Seidel, of Chicago (Robert G. Schloerb, Michael M. Lane, and Richard R. Ryan, of Chicago, and White & Case, of New York, New York, of counsel), for appellant Federal Insurance Company.

Jacobs, Williams & Montgomery, Ltd., of Chicago (Barry L. Kroll, Anthony P. Katauskas, and Lloyd E. Williams, Jr., of counsel), for appellees Commercial Union Insurance Company and American Centennial Insurance Company.

Baker & McKenzie, of Chicago, for appellee Globe Indemnity Company.

Dowd & Dowd, of Chicago (Michael E. Dowd, Nancy J. Gleason, and Philip J. McGuire, of counsel), for appellee Northbrook Excess and Surplus Insurance company.

Phelan, Pope & John, Ltd., of Chicago (Peter C. John and Mary Patricia Benz, of counsel), for appellee Zurich Insurance Company.

Pretzel & Stouffer, Chartered, of Chicago, for appellee American Home Assurance Company.

Rooks, Pitts, Fullagar & Poust, of Chicago, for appellee First State Insurance Company.

Bell, Boyd & Lloyd, of Chicago (Frank K. Heap, D. Daniel Barr, Charles T. Martin, Jeffrey A. Blevins, Joan S. Kato, Sally M. Green, P. Andrew Fleming, and Harry D. Day, of counsel), for appellee Raymark Industries, Inc.

McDermott, Will & Emery, of Chicago (Theodore A. Groenke and Walter M. Jones, of Chicago, and Drinker, Biddle & Reath, of Washington D.C., of counsel), for *amici curiae* American Motorist Insurance Company and American Manufacturing Mutual Insurance Company.

Reuben & Proctor, of Chicago (Gary M. Elden, Philip C. Stahl, Donald A. Vogelsang, Irving C. Faber, and Richard A. Epstein, of counsel), for *amicus curiae* Fireman's Fund Insurance Company.

Haskel & Perrin, of Chicago (Donald M. Haskell, Michael J. Sehr, and Dion J. Sartorio, of counsel), for *amicus curiae* Home Insurance Company.

Keck, Mahin & Cate, of Chicago (James T. Otis, Robert A. Creamer, Robert C. Gislason, and Patty J. Dyer, of counsel), for *amicus curiae* United States Gypsum Company.

Dinsmore & Shohl, of Cincinnati, Ohio (Gerald V. Weigle, Jr., Joanne B. Grossman, Thomas W. Hardin, and Christopher M. Nalley, of counsel), for *amicus curiae* Liberty Mutual Insurance Company.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

The present consolidated appeals arise out of a declaratory judgment action brought to determine the rights and obligations of various insurers to provide defense and indemnity in thousands of lawsuits involving asbestos-related claims filed against the insured, Raymark Industries, Inc. The trial court entered an order determining that insurance coverage for asbestos-related claims is triggered both by exposure to asbestos and by the manifestation of asbestos-related disease, but specifically reserved ruling on the allocation of indemnity and defense costs among Raymark's primary insurers. The

insurers appeal, and Raymark cross-appeals.

Initially, we observe that this appeal involves certain issues which are novel to Illinois courts, but which have been grappled with by Federal courts around the country. The courts, in determining the obligations of insurance companies with regard to asbestos-related litigation, have offered completely different interpretations of the manner in which virtually identical insurance policies allocate liability among successive insurers and between insurers and insureds. Some of the issues now before this court have been described as "difficult" by one court, "impossible" by another court, and in one judge's words, issues which " 'will perplex both district and circuit courts until they are resolved by the ultimate appellate authority.' " (See *Lac d'Amiante du Quebec, Ltee. v. American Home Assurance Co.* (D.C.N.J. 1985), 613 F. Supp. 1549, 1551.) With this in mind, we will review the background of the present litigation.

Raymark, formerly known as Rabestos-Manhatten, Inc., manufactures asbestos-containing products. During the past decade, Raymark has been sued by more than 25,000 claimants who allege that they have been injured by exposure to asbestos-containing products manufactured by Raymark. The claims have been brought primarily by individuals who developed one or more of three asbestos-related diseases: asbestosis, mesothelioma and bronchogenia carcinoma. Most of the claimants in the underlying suits allege they were exposed to asbestos during the 1940's, 1950's and 1960's.

Raymark has been insured since 1941 under various comprehensive general-liability insurance policies issued by the insurance companies involved as parties in this case. Specifically, the Employers' Liability Assurance Corporation, the predecessor in interest to Commercial Union Insurance Company (Commercial Union), insured Raymark from May 1, 1941, through May 1, 1945, and from February 4, 1947, through February 4, 1950. Between February 1950 and September 1951, Raymark was insured by Globe Indemnity Company (Globe). From September 26, 1951, through September 1967, Raymark was insured by Federal Insurance Company (Federal) and its predecessor in interest, United States Guarantee. Commercial Union insured Raymark from September 1967 through October 15, 1969. Since October 15, 1969, Raymark has been insured by Zurich Insurance Company (Zurich). Northbrook Excess & Surplus Insurance Company (Northbrook) has issued policies of excess insurance to Raymark since 1976.

In 1978, Zurich filed the present declaratory judgment action against Raymark, Federal, and Commercial Union to determine ques-

tions of coverage and defense for the asbestos claims filed against Raymark. In February 1979, Northbrook intervened as a plaintiff requesting relief similar to that sought by Zurich. In September 1981, Zurich filed an amended complaint adding Globe as a defendant.

On October 4, 1982, Raymark filed a counterclaim for declaratory judgment against Zurich, Commercial Union, Federal and Globe. Raymark sought a declaration that each of its insurers is obligated to provide indemnity and defense for asbestos-related claims in accordance with their contracts of insurance; a declaration that the insurers in the past had refused in bad faith to fully defend and indemnify Raymark; and such further relief as the court deemed just and proper.

The policies that each of the insurance companies issued to Raymark are nearly identical in terms of coverage language. They provide as follows:

"I. COVERAGE

The (insurance) company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury *** caused by an occurrence ***.

Definitions

'Bodily injury' means bodily injury, sickness or disease sustained by any person.

* * *

'Occurrence' means an accident, including injurious exposure to conditions, which results in bodily injury during the policy period neither expected nor intended from the standpoint of the insured."

Three different theories of coverage have been advanced by the parties during the litigation. The "exposure theory," advocated by Zurich and Northbrook, provides that coverage of asbestos-related claims should be based solely on the claimant's period of exposure to asbestos. If the exposure occurs during the policy period of more than one carrier, the coverage and defense obligations would be apportioned *pro rata* among the carriers on the risk during any period of exposure. The exposure theory proponents urge that medical evidence shows that bodily injury takes place at or shortly after exposure to asbestos and therefore coverage and defense obligations must be tied to exposure. The exposure theory was adopted first by the Sixth Circuit (*Insurance Co. of North America v. Forty-Eight Insulations, Inc.* (6th Cir. 1980), 633 F.2d 1212, *clarified* (6th Cir. 1981), 657 F.2d 814, *cert. denied* (1981), 454 U.S. 1109, 70 L. Ed 2d 650, 102 S. Ct. 686, *rehearing denied* (1982), 455 U.S. 1009, 71 L. Ed. 2d 878, 102 S. Ct.

1648), and later by the Fifth Circuit (*Porter v. American Optical Corp.* (5th Cir. 1981), 641 F.2d 1128, *cert. denied* (1981), 454 U.S. 1109, 70 L. Ed. 2d 650, 102 S. Ct. 686) and Eleventh Circuit (*Commercial Union Insurance Co. v. Sepco Corp.* (11th Cir. 1985), 765 F.2d 1543).

Commercial Union and Federal rely on the "manifestation theory." Under this theory, coverage and defense obligations are not triggered until the occurrence insured against has "manifested" itself in such a manner as to be medically detectable and diagnosable. The proponents of this theory assert that the court, in interpreting the policy terms, must focus on the word "disease" rather than bodily injury. They contend that medical evidence from the clinician's standpoint clearly shows that asbestos-related diseases are undiagnosable until an individual has developed recognizable signs or symptoms. The manifestation theory has been adopted by the First Circuit (*Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.* (1st Cir. 1982), 682 F.2d 12, *cert. denied* (1983), 460 U.S. 1028, 75 L. E. 2d 500, 103 S. Ct. 1280).

The third theory of coverage is advanced solely by Raymark and is referred to as the *Keene* theory, or the hybrid approach. This theory is based on the opinion in *Keene Corp. v. Insurance Co. of North America* (D.C. Cir. 1981), 667 F.2d 1034, *cert. denied* (1982), 455 U.S. 1007, 71 L. Ed. 2d 875, 102 S. Ct. 1644, and provides that coverage under the comprehensive general liability policies is triggered by injury, and that such injury occurs from first inhalation of asbestos through exposure and until clinical manifestation of an asbestos-related disease. Obviously, this theory provides Raymark with the maximum amount of insurance coverage.[1] More recently, the *Keene* theory was adopted by the Third Circuit. (*Acands, Inc. v. Aetna Casualty & Surety Co.* (3rd Cir. 1985), 764 F.2d 968.) Accord, *Lac d'Amiante du Quebec, Ltee. v. American Home Assurance Co.* (D.C.N.J. 1985), 613 F. Supp. 1549.

In 1981 and 1982, cross-motions for summary judgment on the trigger of coverage issue were filed by Zurich, Commercial Union and Raymark. The court denied the motions, stating that medical evidence was necessary to determine how the policy terms "bodily injury, sick-

---

[1]Pursuant to stipulation with Raymark and a court order, Globe took no formal position during the proceedings below on the question of when "bodily injury" or "disease" occurs in asbestos-related claims asserted against Raymark and agreed to be bound by the ultimate ruling on this issue. In a letter to this court, counsel for Globe stated that the issues have been covered adequately by the other parties and therefore it will not submit any briefs on appeal.

ness or disease" apply to asbestos-related disease. The court thereafter heard extensive medical testimony from nine experts who were board certified clinicians or pathologists.[2]

Zurich called as witnesses two board-certified pathologists, Dr. John Craighead and Dr. Jerold Abraham, and one board-certified clinician, Dr. David Cugell. Testifying on Commercial Union's behalf were board-certified clinicians Dr. Ronald Crystal and Dr. James Merchant, who is also certified in epidemiology.[3] Federal called as a witness Dr. Theodore Rodman, a board-certified clinician. Raymark presented the testimony of clinician Dr. Margaret Turner-Warwick and two pathologists, Dr. Donald Greenberg[4] and Dr. Elliott Kagan, who is also board certified in immunology.

At the conclusion of the medical testimony, the trial court issued a lengthy memorandum opinion and order in which it did a commendable job of summarizing and evaluating the evidence. The following summarization of the medical testimony is taken in large part from the court's memorandum opinion.

As the trial court observed, the expert testimony falls into two distinct categories: The pathologists' view of asbestos-related diseases and the clinicians' view of asbestos-related diseases. There is no disagreement by the experts as to how the diseases develop. Rather, they disagree as to how to define "injury" and "disease" and at what stage they are willing to characterize a condition as being either "injury" or "disease."

The pathologists define injury as "an alteration of structure and function of a cell, tissue or organ." Injury includes physical or chemical damage to the body which may be detectable only on a microscopic or subclinical level. Disease is defined as an ongoing process of repair or reaction to injury.

The clinicians' definition of "injury" requires that there be some kind of noticeable harm. For example, Dr. Merchant testified that injury refers only to trauma caused by an internal force. Dr. Rodmar defined injury as significant damage which results to structure or functions as a result of an external force either physical or chemical.

---

[2]Pathology is the study of the essential nature of diseases, especially of the structural or functional changes in tissue and organs which cause or are caused by disease. (Dorland's Medical Dictionary (26th ed. 1981).)

[3]Epidemiology is the study of the relationships of the various factors determining the frequency and distribution of diseases in a human community. (Dorland's Medical Dictionary (26th ed. 1981).)

[4]Dr. Greenberg did not appear at the hearing. His deposition was read into evidence.

Both doctors refer to disease as a clinical concept requiring detectable abnormalities in appearance and function.

In terms of the diseases themselves, the pathologists testified that the process which culminates in asbestosis starts with the exposure to and inhalation of asbestos fibers. Asbestos fibers are sphere-like structures which vary in terms of their size, length and diameter. Following inhalation, the body's own defense mechanisms eliminate most fibers. Depending, however, upon the volume and duration of exposure, the average active worker would have retained in his lungs as many as one million asbestos fibers during the course of one year. If they are not eliminated, the fibers settle in the lower portions of the lung known as the respiratory bronchioles and alveolar duct bifurcations. The sharp ended fibers, likened to slivers of glass, are thought to act as spears injuring the walls of the alveoli with each inhalation and expiration.

The fibers lie on the surface layer of cells and immediately begin to interact with the membranes of the cells. The fibers often become partially imbedded within the cell body. The presence of the fibers activates certain scavenger cells known as alveolar macrophages, which rapidly accumulate around the fibers in an attempt to engorge the foreign bodies. The macrophage, however, is unable to digest the inorganic fiber and eventually the fiber will cause the macrophage membrane to disintegrate, releasing harmful enzymes into the lung tissue. Once the macrophage is damaged, it secretes a substance which attracts other macrophages to the scene. This secretion results in an additional release of destructive enzymes which attract further macrophages. Macrophages also summon lymphocytes[5], which stimulate the macrophages to work harder. This results in more enzymes and macrophages which, in turn, result in more lymphocytes.

Both lymphocytes and macrophages, as well as the fibers themselves, are responsible for calling in fibroblasts, which are the cells responsible for producing collagen or connective tissue. Fibroblasts normally function within the interstitium of the lung, producing enough collagen to keep the lungs from collapsing. With the onset of macrophages and lymphocytes, however, the number of fibroblasts in the lower portion of the lung increases and, as a result, more collagen is produced which forms scar tissue or fibrosis. This fibrostic scar tissue

---

[5]Lymphocytes are white blood cells formed in the lymphoid tissue located throughout the body. Dr. Kagan testified that lymphocytes, which are responsible for producing antibodies, are overstimulated by asbestos fibers, resulting in a disturbance in the body's immune system. Dr. Kagan stated that such overstimulation often results in cancer.

in the alveoli prevents the lung from performing its normal oxygen-carbon dioxide gas exchange and eventually results in asbestosis.

The pathologists testified, within a reasonable degree of medical certainty, that the injury process which results in these changes to the lungs' structure and function begins at or very shortly after inhalation and retention of asbestos fibers. Based on experimental studies using animal and human tissue, the pathologists opined that the cells react to the presence of the fibers almost immediately.

The pathologists acknowledge that much less is medically understood about bronchogenic carcinoma (lung cancer) and mesothelioma. Dr. Craighead testified that bronchogenic carcinoma is a neoplasm of cancer that originates from cells lining the bronchial tubes. He stated that limited experimentation indicates asbestos alone would not induce this type of cancer, but when coupled with cigarette smoke, the two interact in some carcinogenic fashion to cause cancer.

Bronchogenic carcinoma goes through several stages before it is clinically detectable. The first stage, which begins shortly after the deposition of fibers in the lung, is called dysplasia and can be detected only pathologically. After some time, the dysplasia cells become cancer cells. It is not known what causes this transformation. The next stage, "cancer in situ," is a noninvasive type of cancer and is still undetectable by X ray. The tumor eventually spreads and expands in the lung and becomes large enough to detect.

Mesothelioma develops from cells that line the pleura, which is the outer lining of the lung. While little is known about this disease, it is hypothesized that asbestos fibers pierce through the alveoli and into the pleura. The fibers cause injury and irritation to the lining, thereby creating a premalignant disease stage called atypia. It is believed that these premalignant activities occur shortly after deposition of the fibers, followed by a long latency period and subsequent manifestation of a mesothelial tumor.

The clinicians concurred with much of the pathologists' testimony concerning the mechanics of asbestosis, bronchogenia carcinoma, and mesothelioma. For example, they agreed that once retained, an asbestos fiber may be acted upon by macrophages and enzymes, thereby resulting in the production of fibrous tissue in the lung. Where the clinicians disagree with the pathologists is with regard to when the disease process commences.

Throughout their testimony, the clinicians focused on the factor of individual susceptibility. It was their opinion that the lungs' defense mechanisms are able to successfully deal with the presence of asbestos fibers for a certain period of time. The clinicians state that even if

microscopic injury occurs in the air sacs the lung has the ability to repair itself on a local level, including the ability to reverse fibrosis. At some point, however, for some unknown reason the body's defenses can no longer handle the fibers and the damage they cause. It is at that point that asbestosis begins to develop. Each individual's ability to deal with asbestosis differs, and thus no general rules are applicable. The clinicians concluded that due to the variability and uncertainty inherent in asbestos-related diseases, a disease does not occur until it can be diagnosed.

Based on the foregoing testimony and the policy language, the trial court ruled that coverage was to be provided if an insurer's policy was in effect either when the claimant was exposed to Raymark's products or when the claimant's condition resulting from that exposure manifested itself, but not if its policies were in effect only during the period after a claimant was exposed to the products but before his condition manifested itself.

Zurich, Northbrook, Commercial Union, Federal and Globe appeal the court's determination as to coverage. Raymark has filed a cross-appeal challenging only the court's finding that coverage is not triggered under those policies in effect between the time of exposure and manifestation. Additionally, each of the insurers appeal the court's later rulings as to other issues, including their duty to defend Raymark following exhaustion of their policies' indemnity limits. The court reserved ruling on the rights and obligations as between the various insurers, pending the outcome of this appeal.

The following issues are presented for our review: (1) whether the trial court correctly determined what triggers coverage under the policies in question; (2) whether the trial court erred in holding that Federal, Commercial Union and Globe had a duty to defend claims against Raymark even after the limits of their pre-1966 policies had been exhausted; (3) whether the trial court erred in holding that Zurich is required under its post-1966 policies to continue to pay defense costs incurred by Raymark in certain pending cases even after proper exhaustion of the policy limits; (4) whether the trial court erred in striking the jury demands of Federal, Commercial Union, and Globe; (5) whether the trial court erred in denying Zurich's motion for a *pro rata* allocation of obligations among triggered policies; (6) whether the trial court erred in denying Northbrook's post-trial motion for clarification of its September 29, 1983, order concerning Northbrook's duty to defend Raymark; and (7) whether the trial court erred in determining the existence and coverage of certain policies sold to Raymark by Commercial Union's predecessor in interest.

An *amicus curiae* brief as been filed by United States Gypsum Company in support of Raymark's position concerning the trigger of coverage and duty to defend following exhaustion of the policy limits. An *amicus curiae* brief filed by The Home Insurance Company and a joint *amicus curiae* brief filed by American Motorists Insurance Company and American Manufacturers Mutual Insurance Company urge this court to adopt the "exposure-only" theory and to reverse the court's denial of a *pro rata* allocation. Finally, *amicus curiae* briefs filed by Liberty Mutual Insurance Company and Fireman's Fund Insurance Company urge both adoption of the "manifestation-only" theory and reversal as to the court's ruling on the duty to defend following exhaustion of the policy limits.

Before addressing the merits of the issues now before us, we note briefly that on November 18, 1983, Federal filed a motion to join as necessary parties in Zurich's declaratory judgment action three of Raymark's first-layer excess carriers—American Home Assurance Company, First State Insurance Company, and American Centennial Insurance Company. On November 22, 1983, the trial court granted the joinder motion and ordered that Zurich's complaint be amended to add as defendants the three excess insurers. The propriety of the trial court's decision to join the excess carriers as defendants is the subject of another appeal to this court (*Zurich Insurance Company v. Raymark Industries, Inc.* (1986), 144 Ill. App. 3d 943).

I ·

█ We will first review the propriety of the trial court's determination as to what triggers coverage under the policies at issue. In so doing, we observe initially that general rules of construction which apply to other contracts apply with equal force to insurance contracts. (*DeFoor v. Northbrook Excess & Surplus Insurance Co.* (1984), 128 Ill. App. 3d 929, 471 N.E.2d 938.) As such, all of the provisions of an insurance contract, rather than isolated parts, should be read together to interpret it. (*United States Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 429 N.E.2d 1203.) The words of the policy should be interpreted in accordance with their plain and ordinary meaning where they are clear and unambiguous. (88 Ill. 2d 1, 429 N.E.2 1203.) When interpreting words according to their common and ordinary meaning, Illinois courts often rely on dictionary definitions. See, *e.g.,* *Kozak v. Retirement Board* (1983), 95 Ill. 2d 211, 447 N.E.2d 394.

Under the policies in question, coverage is triggered by "bodily injury, sickness or disease" which occurs during the policy period. As the trial court found, the terms themselves are not inherently ambigu-

ous. Rather, the problem lies in how these terms apply to asbestos-related diseases.

The application of these terms in the context of asbestos-related diseases was the subject of considerable testimony during the proceedings below, with the pathologists focusing on the word "injury," while the clinicians focused on the word "disease." The trial court correctly determined, however, that each of the three terms is separate and distinct, as evidenced by the use of the disjunctive "or," and must be considered separately as a trigger of coverage. (*People v. Vraniak* (1955), 5 Ill. 2d 384, 125 N.E.2d 513, *cert. denied* (1955), 349 U.S. 963, 99 L. Ed. 1285, 75 S. Ct. 895.) Accordingly, coverage under the policies is triggered either by "bodily injury" or "disease" or "sickness."

### A

In determining that coverage is triggered by exposure, the trial court focused on the term "bodily injury." The word "injury" is defined as harm or damage. (Webster's Third New International Dictionary 1164 (1981).) The adjective "bodily," which modifies injury, is defined as "of, or relating to the body." (Webster's Third New International Dictionary 245 (1981).) Taken together, the plain meaning of the term "bodily injury" is harm or damage of, or relating to the body.

The pathologists' definition of injury is consistent with the plain meaning of the term. They define injury as damage to the cells or tissue of the body regardless of whether the damage is clinical or subclinical. Applying this definition to the evidence, it is apparent that "bodily injury" occurs simultaneously with or shortly after inhalation of asbestos. The testimony, based on substantial experimentation, established that the inhalation of asbestos fibers causes injury to the cells of the lung at or shortly after inhalation. Within only hours after exposure, a fiber can physically damage or destroy a cell by puncturing it or, as more commonly occurs, can stimulate a series of cellular responses which result in the development of fibrotic scar tissue in the victim's lungs. Each additional inhalation results in further injury and in the buildup of additional fibrotic tissue.

The "manifestation-only" proponents do not challenge the assertion that asbestos fibers injure the lungs in this manner and in a relatively short period of time after retention. Rather, they argue only that the body's defense mechanisms are capable of "repairing" localized injury, at least temporarily, thereby precluding one from determining exactly when disease begins to develop in an individual. By

such argument, however, they necessarily admit that some kind of harm, damage or "injury" occurs upon exposure and inhalation. As the trial court correctly concluded, that injury, in and of itself, is sufficient to trigger coverage under the plain meaning of the policies.

We must further reject the argument of the "manifestation only" proponents that the trial court improperly adopted the technical, medical definition of the term "injury." The trial court correctly recognized that once the injurious process in the lung caused by the inhalation of asbestos was explained, the average person would agree that the inhalation of asbestos causes contemporaneous injury as that term is normally understood. That injury is damage to the cells of the lung, the vital organ which allows the body to obtain oxygen to sustain life. Inhalation of asbestos prevents that vital process from occurring as it should and, in fact, scar tissue actually forms in the lung as a result of the asbestos inhalation. The injury which occurs at the time of exposure impairs the ability of the cells of the lung to perform their vital function. The fact that the cell damage is subclinical and requires medical research to verify does not detract from the fact that a real injury occurs.

The trial court's decision in this regard is neither novel nor exceptional. The conclusion that bodily injury occurs upon exposure is supported by the opinions of several other courts. "[I]nternal tissue damage is bodily injury, even before it later manifests as disease that can be medically diagnosed." (*Sandoz, Inc. v. Employer's Liability Assurance Corp.* (D.N.J. 1983), 554 F. Supp. 257, 265.) "The term 'bodily injury' must be construed against the insurer to include the pre-manifestation microscopic damage." (*Commercial Union Insurance Co. v. Pittsburgh Corning Corp.* (E.D. Pa. 1981), 553 F. Supp. 425, 434.) "The medical evidence is uncontroverted that bodily injury in the form of tissue damage takes place at or shortly after the initial inhalation of asbestos fibers." (*Insurance Co. of North America v. Forty-Eight Insulations, Inc.* (6th Cir. 1980), 633 F.2d 1212, 1222, *cert. denied* (1981), 454 U.S. 1109, 70 L. Ed. 2d 650, 102 S. Ct. 686, *rehearing denied* (1982), 455 U.S. 1009, 71 L. Ed. 2d 878, 102 S. Ct. 1648.) In *Porter v. American Optical Corp.* (5th Cir. 1981), 641 F.2d 1128, 1144, *cert. denied* (1981), 454 U.S. 1109, 70 L. Ed. 2d 650, 102 S. Ct. 686, the court, in finding that exposure to asbestos triggers coverage, stated:

> "There was medical evidence that each introduction of fibers into Porter's lungs was 'bodily injury,' cumulatively and progressively more harmful to the victim."

See also *Commercial Union Insurance Co. v. Sepco Corp.* (11th Cir.

1985), 765 F.2d 1543.

Accordingly, we find ample support for the trial court's finding that exposure to asbestos is one trigger of coverage under the policies at issue.

### B

■ As noted above, bodily injury is not the sole trigger of an insurer's obligations under the subject policies; "sickness" or "disease" also give rise to the duty to indemnify and defend. In finding that coverage is triggered at the time of manifestation, the court relied on the term "disease." The plain meaning of the term "disease" is "an impairment of the normal state of the living animal *** or any one of its components that interrupts or modifies the performance of the vital functions." (Webster's Third New International Dictionary 648 (1981).) Based on this definition, the trial court determined that disease occurs and policy obligations are triggered when asbestosis, bronchogenic carcinoma, and mesothelioma reach the stage where they significantly impair the lung's functions. This is usually the point in time when the diseases are capable of detection and diagnosis by the clinician. The clinicians testified that the precise time of diagnosis varies depending upon the individual. Consequently, as the trial court found, this presents a question of fact to be resolved on a case-by-case basis. Given the plain meaning of the term "disease" and the evidence presented at trial, we find no reason to disturb the court's finding that coverage is also triggered at the time of manifestation.

The trial court additionally made certain findings concerning the term "sickness." The plain meaning of this term is "a disordered, weakened or unsound condition." (Webster's Third New International Dictionary 2111 (1981).) The trial court noted that prior to the time that the disease is manifested, the body's condition is "clearly not normal." The court therefore concluded that if during this "pre-disease" stage an individual "suffers from a disordered, weakened or unsound condition but it has not yet progressed to the point of impairment," he may be classified as having "sickness," which would trigger liability under the plain meaning of the policies. This finding appears to be a reasonable conclusion drawn from the evidence presented and is therefore affirmed.

### C

■ We next consider whether the trial court erred in rejecting the *Keene* or "triple trigger" theory advocated by Raymark and supported by *amicus curiae* United States Gypsum Company.

Relying on the expert testimony of Dr. Margaret Turner-Warwick and the decision in *Keene Corp. v. Insurance Co. of North America* (D.C. Cir. 1981), 667 F.2d 1034, *cert. denied* (1982), 455 U.S. 1007, 71 L. Ed. 2d 875, 102 S. Ct. 1644, Raymark argues that there is a progression of separate new injuries after cessation of exposure which trigger each and every policy between the time of the first exposure and clinical manifestation. The trial court rejected Raymark's argument, reasoning that the medical evidence did not support a finding that injury always occurs in the absence of exposure. This court is bound by the court's finding unless it is against the manifest weight of the evidence. *Village of Hillside v. John Sexton Sand & Gravel Corp.* (1983), 113 Ill. App. 3d 807, 447 N.E.2d 1047.

After reviewing the record before us, we believe that the trial court properly concluded that the medical evidence presented at trial did not support Raymark's argument that injury always occurs in the absence of exposure. There was no evidence showing that new injury occurred after exposure in every person who ultimately was diagnosed as suffering from asbestos-related injury. Raymark's reliance on the testimony of Dr. Turner-Warwick is misplaced. Dr. Turner-Warwick did not testify that progression of a new injury occurs in every case after exposure ceases. Rather, her testimony, which was based on a study she conducted, showed that the progression of injury, when it occurs, is not continuous but is sporadic. In those patients who show such progression, injury progresses at different rates and may not progress at all for many years. As such, Raymark has failed to demonstrate that the court's finding as to this matter was manifestly erroneous.

Moreover, we note that the *Keene* court, in adopting the "triple trigger" theory, admittedly did not rely on medical evidence. (*Keene Corp. v. Insurance Co. of North America* (D.C. Cir. 1981), 667 F.2d 1034, 1044 n.19.) Rather, the court there concluded that the terms "bodily injury," "sickness" and "disease" are ambiguous and lack the precision necessary to identify the event or events by which coverage is triggered in claims of asbestos-related bodily injury. The *Keene* court thus declined to interpret the language as written and relied on the "reasonable expectations" doctrine to hold that coverage is triggered under each policy on the risk at any time from a claimant's initial exposure, through the latency period, to and including the manifestation of asbestos-related injury. The "reasonable expectations" theory provides:

> "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts

will be honored *even though painstaking study of the policy provisions would have negated those expectations."* (Emphasis added.) (667 F.2d 1034, 1042 n.12.)

The "reasonable expectations" doctrine is not recognized in Illinois. *Bain v. Benefit Trust Life Insurance Co.* (1984), 123 Ill. App. 3d 1025, 463 N.E.2d 1082; *Insurance Co. of North America v. Adkisson* (1984), 121 Ill. App. 3d 224, 459 N.E.2d 310.

As another court has recognized, and as the *Keene* court itself came close to acknowledging, the "triple trigger" theory is nothing more than a "result oriented" exercise in judicial legislation. (*American Home Products Corp. v. Liberty Mutual Insurance Co.* (S.D.N.Y. 1983), 565 F. Supp. 1485, 1511.) *Keene* represents a departure from the rules governing the construction of contracts in this State and is therefore inapplicable here. Consequently, the trial court's determination as to the trigger of coverage is affirmed in its entirety.

## II

■ We next address the issue of whether the trial court erred in holding that Commercial Union, Federal and Globe had a duty to defend claims against Raymark even after the limits of their pre-1966 policies are exhausted by payments of judgments or settlements. The insurers contend that their duty to defend is tied to the indemnity limits of their policies. After carefully examining the relevant policy language, we agree.

The introductory sentence to the pre-1966 policies specifically makes the insuring agreements (including the duty to defend) "subject to the limits of liability, exclusions, conditions and other terms of this policy." The defense, settlement and supplementary payments clause provides in pertinent part:

"With respect to such insurance as is afforded by the other terms of this policy the Company shall[6]:

(a) defend in his name and behalf any suit against the Insured alleging such bodily injury \*\*\* and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the Company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the Company \*\*\*."

We believe that the initial qualifying statement making the insur-

---

[6]Policies sold between 1941 and 1955 contained the introductory language, "As respects the insurance afforded by the other terms of the policy," instead of, "With respect to such insurance as is afforded."

ing agreements "subject to the limits of liability" clearly evinces an intent by the parties to make each of the insuring agreements, including the duty to defend, subject to the policy's indemnity limits. This court is obliged to construe an insurance policy so as to carry out the true intent of the parties. (*Seeburg Corp. v. United Founders Life Insurance* (1980), 82 Ill. App. 3d 1034, 403 N.E.2d 503.) The parties' intent must be gleaned from the language of the contract as a whole (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 475 N.E.2d 872), and this court may not stretch to find ambiguity where it is not present (*United States Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 429 N.E.2d 1203). Here, the language of the relevant provisions of the policy, taken as a whole, clearly establishes there is no duty to defend after the limits of liability have been properly paid out in judgments or settlements.

Our result above is supported by recent asbestos-coverage decisions construing policy language identical in relevant respects to the language at issue here. In *Acands, Inc. v. Aetna Casualty & Surety Co.* (3rd Cir. 1985), 764 F.2d 968, the Third Circuit held that the district court erred in construing pre-1966 policies to require the insurer to defend cases indefinitely, irrespective of its policy limits. The court stated, "If, at the outset of a particular action, it is properly established that the insurer cannot possibly be liable for indemnification because policy limits have been exhausted, then the policy language does not impose a duty to defend that action ***." 764 F.2d 968, 975.

*Acands* specifically left open the question of whether an insurer may terminate its defense of a claim in "mid-course." (764 F.2d 968, 975.) The Third Circuit recently addressed that question in *Commercial Union Insurance Co. v. Pittsburgh Corning Corp.* (3rd Cir. 1986), 789 F.2d 214. There, it was held that an insurer, pursuant to a pre-1966 policy, is not obligated to continue to fund the defense of any asbestos-related actions after its duty to indemnify had been terminated by payment of judgments or settlements and it had made an orderly withdrawal from the insured's defense. The *Commercial Union* court examined the same policy language that we quoted above and found that it unambiguously links the duty to defend to the indemnity limits of the policy. It further noted that nothing in the policy language suggests that the duty to defend automatically "attaches" at the outset of the litigation and cannot afterwards terminate once the policy limits are exhausted. (789 F.2d 214, 218.) The court observed:

> "Interpreting the policy in this manner also leads to the most reasonable allocation of defense responsibilities. A carrier that is obligated to pay for both defense and indemnification has an

incentive to minimize its total liability, and thus the total costs arising from a claim. By contrast, severing the duty to defend from the duty to indemnify creates a serious conflict of interest, with one carrier wishing to minimize litigation costs and the other intent on litigating even marginally contestable claims. This conflict is acute regardless of which carrier has actual control of the defense ***." (789 F.2d 214, 219.)

Finally, the *Commercial Union* court stated that the fact the defense provision of the standard comprehensive general-liability policy was amended in 1966 does not cast doubt on the clarity of the pre-1966 policy language, reasoning as follows:

"The post-1966 policies state that the insurer is not liable to defend any claims 'after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.' The district court evidently viewed the act of adopting this provision as an implicit acknowledgement that the pre-1966 policies might reasonably be interpreted not to contain any such limit on the duty to defend. Whether the new language was primarily intended to clarify the limits on the duty to defend might be disputed; another court has held that the new provision was intended only to prohibit the insurer from tendering the policy limits to the court and thereby avoiding its defense duty. *Keene Corp. v. Insurance Co. of North America* 597 F. Supp. 946 (D.D.C. 1984), *vacated as moot*, No. 78—1011 (D.D.C. Sept. 24, 1985). In any event, however, we think that this amendment merely makes even more explicit the extent of an insurers [*sic*] obligation in the context of its contractual duty to defend." 789 F.2d 214, 220.

We concur with the reasoning of the Third Circuit and conclude that the pre-1966 policies at issue do not oblige the insurers to assume the cost of defending actions against Raymark after their duty to indemnify has been properly terminated by the payment of judgments or settlements and they have made an orderly withdrawal from Raymark's defense.

### III

■ Next, we turn to Zurich's contention that the trial court erred in holding that it is required under its post-1966 policies to continue to pay defense costs even after proper exhaustion of the policy limits. Zurich asserts that its post-1966 policies contain language which expressly terminates the duty to defend upon exhaustion of the policy limits as follows:

"[Zurich] shall have the right and duty to defend any suit against the insured seeking damages *** and may make such investigation and settlement of any claim or suit as it deems expedient, *but [Zurich] shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of [Zurich's] liability has been exhausted by payments of judgments and settlements.*" (Emphasis added.)

In its order of July 26, 1984, the trial court found that the language of Zurich's policy was clear and unambiguous, but it went on to hold that upon exhaustion of its policy limits, Zurich could cease paying defense costs in pending cases which were within Zurich's coverage prior to the time of exhaustion *only* if another carrier agreed to honor its obligation to pay those costs. In the event that no other insurer would be obligated to pay costs of defense for a particular pending claim or in the event that another insurer declined to honor its obligation, Zurich would remain obligated to pay defense costs until the claim was resolved by judgment or settlement. Zurich urges this court to modify the order to provide that its duty to defend ceases, unconditionally, upon exhaustion of the policy limits.

Raymark argues that Zurich has waived any objection to this issue because it drafted the above order. The record shows, however, that Zurich merely prepared the order at the judge's direction. An order prepared at the direction of the trial court cannot be characterized as an " 'an agreement of the parties' " and is therefore appealable by those prejudiced by it. (*In re Estate of Cohen* (1983), 112 Ill. App. 3d 265, 269, 445 N.E.2d 391.) Accordingly, Raymark has failed to affirmatively show a waiver.

■■ We believe that the order in question should be modified because it is inconsistent with the clear and unambiguous language of Zurich's policies. We note that many of the insurers in this case, including Zurich, have already relinquished control of the defense of asbestos cases in which Raymark is a defendant and have permitted Raymark and its separate counsel to control the defense. The insurers only pay the cost of Raymark's defense. The modification urged by Zurich will not prejudice the defense of Raymark since the exhaustion of Zurich's limits would not create any need to retain new counsel or otherwise interfere with the ongoing defense of any case. The only change is in the identity of the entity paying the defense costs.

Raymark urges that even though Zurich relinquished control, its financial viability would be jeopardized if Zurich were to cease paying defense costs for even a single day when another carrier has declined to honor its obligation to defend. The possible financial burden of

which Raymark complains, however, does not constitute the legal prejudice required to invoke judicial protection. See *Liberty Mutual Insurance Co. v. Mead Corp.* (1963), 219 Ga. 6, 131 S.E.2d 534.

Accordingly, we hereby modify the order of July 26, 1984, to provide that under post-1966 policies, the aggregate limits of which have been exhausted by payment of judgments or settlements, Zurich has no obligation to continue to pay defense costs in cases it had undertaken to defend prior to the exhaustion of the policy limits.

### IV

Federal and Commercial Union argue that the trial court erred in granting the motion of Zurich and Raymark to strike their jury demands.[7] We disagree.

The right to a jury trial in a civil action arises pursuant to article I, section 13, of the Illinois Constitution which provides: "The right of trial by jury, as heretofore enjoyed, shall remain inviolate." It is held that this provision "guarantees *** the right to a trial by jury as it existed in common law actions when the constitution was adopted. There was then and there is now no constitutional right of trial by jury in equity." (*Lazarus v. Village of Northbrook* (1964), 31 Ill. 2d 146, 148, 199 N.E.2d 797.) Whether an action is one in which there is a right to a jury trial can only be determined by an examination of the proceedings. The determination as to whether the right to a jury exists in a particular case depends primarily on the substance of the controversy rather than on the form of the action. *Flaherty v. Murphy* (1920), 291 Ill. 595, 126 N.E. 553.

The present case involves a complaint and a counterclaim which both seek a declaratory judgment. Because declaratory judgment actions are neither legal nor equitable but are *sui generis* (*Villiger v. City of Henry* (1977), 47 Ill. App. 3d 565, 362 N.E.2d 120), the right to trial by jury depends upon whether the underlying claims are legal or equitable in nature (*Lazarus v. Village of Northbrook* (1964), 31 Ill. 2d 146, 199 N.E.2d 797). If the underlying action is one for relief historically available only in a court of equity, the issues raised by the pleadings are equitable and any issues of fact are tried to the court without a jury. *Weininger v. Metropolitan Fire Insurance Co.* (1935), 359 Ill. 584, 195 N.E. 420.

The trial court in this case correctly determined that the pleadings are substantively in the nature of equitable actions. First, Zurich's complaint, in essence, seeks contribution from Raymark's other

---

[7]Globe had also filed a jury demand.

primary insurers for liability arising from the defense and coverage of asbestos-related lawsuits. As this court has recognized, "[i]n insurance law, contribution is an equitable principle arising among co-insurers which permits one who has paid the entire loss to be reimbursed from other insurers who are also liable for the loss." (*Royal Globe Insurance Co. v. Aetna Insurance Co.* (1980), 82 Ill. App. 3d 1003, 1005, 403 N.E.2d 680, citing 6 Appleman, Insurance Law & Practice sec. 3902, at 422 (1972); see also 4 J. Pomeroy, Equity Jurisprudence sec. 1419 (5th Ed. 1941).) In any contribution action, there must be an identity between the policies as to parties and insurable interests and risks. *Royal Globe Insurance Co. v. Aetna Insurance Co.* (1980), 82 Ill. App. 3d 1003, 1005, 403 N.E.2d 680, citing 16 Couch. sec. 62:160, at 630 (1983).

■ Here, under the specific allegations of Zurich's complaint, all defendant insurers stood severally liable to insure the same party, Raymark, against the same risk—injury, sickness or disease resulting from asbestos exposure—under standard comprehensive liability policies containing similar policy provisions. Zurich alleges in the complaint that it has satisfied more than its proportionate share of the total costs of indemnity and defense owed to Raymark under the numerous policies issued by the defendant insurers. On such pleadings, the trial court correctly construed Zurich's complaint to state a cause of action in equity for contribution.

■ We further find that the trial court properly characterized Raymark's counterclaim as an action for specific performance. Specific performance is an equitable remedy to obtain the performance of some affirmative act by the defendant to fulfill obligations of a contract. (*Carter Oil Co. v. Owen* (E.D. Ill. 1939), 27 F. Supp. 74.) The jurisdiction of chancery to decree specific performance does not proceed upon any distinction as to the subject matter, but proceeds on the ground that damages at law may not, in the particular case, afford a complete remedy. (*Arlington Heights National Bank v. Village of Arlington Heights* (1965), 33 Ill. 2d 557, 213 N.E.2d 264; 33A Ill. L. & Prac. *Specific Performance* sec. 51 (1970).) Illinois courts have long recognized that chancery may specifically enforce contracts relating to insurance where the remedy at law is inadequate. *Rowell v. Covenant Mutual Life Association* (1899), 84 Ill. App. 304; 33A Ill. L. & Prac. *Specific Performance* sec. 51 (1970).

Here, Raymark in its counterclaim seeks a declaration that it is entitled to defense and indemnity for suits alleging asbestos-related injuries under various policies issued by its primary insurers. Both in its pleadings and arguments, Raymark has maintained that it does not

seek money damages and that its remedy at law is inadequate. Raymark notes that several hundred asbestos-related claims are being filed against it each month and argues that if left to its legal remedy it would be required to file a multiplicity of lawsuits, now and in the future, to obtain restitution in the form of damages in each underlying asbestos case for which the primary insurers have wrongfully refused to defend or to indemnify it. Raymark further asserts it does not have the financial resources to bear the enormous costs of defense and indemnity in the 25,000 asbestos-related claims filed to date, and then await a future award of damages for breach of contract. According to Raymark, only specific performance by the insurers of their duties both to defend and indemnify Raymark in existing lawsuits and to restrain future breaches of contract is adequate to place it in the position it would have been in had the insurers performed their contractual obligations.

We agree with Raymark that its remedy at law is inadequate. We observe that Illinois courts have long approved the jurisdiction of chancery courts to declare the rights of parties to contracts of insurance in order to prevent a multiplicity of suits and to render an equitable accounting. (*Weininger v. Metropolitan Fire Insurance Co.* (1935), 359 Ill. 584, 195 N.E. 420; *Jay-Bee Realty Corp. v. Agricultural Insurance Co.* (1943), 320 Ill. App. 310, 50 N.E.2d 973.) Indeed, the prevention of a multiplicity of suits is, in and of itself, a ground of chancery jurisdiction. (*Hickling v. Wilson* (1882), 104 Ill. 54; *Snyder v. Aetna Construction Co.* (1933), 272 Ill. App. 591; 7 Ill. L. & Prac. *Chancery* sec. 52 (1954).) To invoke jurisdiction on this ground, there must be, as there is in the present case, common rights or interests existing among the various insurers, and between the insurers and the insured. (*Weininger v. Metropolitan Fire Insurance Co.* (1935), 359 Ill. 584, 195 N.E. 420.) Furthermore, as in *Weininger*, the facts of the instant case involve "not only the question of multiplicity of suits, but *** the further fact that when the loss is determined some sort of accounting is necessarily required to fix and prorate the amounts for which the defendants are severally liable." 359 Ill. 584, 589, 195 N.E. 420.

We conclude that the trial court properly exercised jurisdiction in equity to declare the common rights and obligations of the parties under the contracts of insurance. Consequently, there was no right to a jury trial on either the complaint or counterclaim.

## V

Zurich argues that the trial court erred in denying its motion to order *pro rata* allocations of obligations among the triggered policies. Zurich had urged that the court declare that indemnity payments

and defense costs be allocated in accordance with the exposure theory as adopted in *Insurance Co. of North America v. Forty-Eight Insulations, Inc.* (6th Cir. 1980), 633 F.2d 1212, *aff'd on rehearing* (1981), 657 F.2d 814, *cert. denied* (1981), 454 U.S. 1109, 70 L. Ed. 2d 650, 102 S. Ct. 686. There, the indemnity and defense obligations were prorated based on the amount of the time that the insurer was on the risk in relation to the total period of exposure to the asbestos. Raymark, on the other hand, urges the court to adopt the approach taken in *Keene Corp. v. Insurance Co. of North America* (D.C. Cir. 1981), 667 F.2d 1034, *cert. denied* (1982), 455 U.S. 1007, 71 L. Ed. 2d 875, 102 S. Ct. 1644, which makes each insurer whose policy is triggered liable for the whole of the injury. In *Keene*, each insurer was made jointly and severally liable to the insured, and the insurers were left to determine amounts of contribution among themselves.

The trial court rejected Zurich's argument, finding that each individual primary insurer whose policy is triggered is obligated to provide Raymark's indemnity and defense. We believe that the trial court's ruling is correct and supported by the language of the policies. Specifically, under the policies, the insurer is obligated to pay "all sums which [Raymark] shall become legally obligated to pay as damages because of bodily injury [which occurs during the policy period] caused by an occurrence." The insurer has a duty to pay "all sums which [Raymark] shall become legally obligated to pay as damages." There is nothing in this language that permits a reduction in the triggered policy's responsibility to pay "all sums."

Similarly, under the policies, each of the insurers has agreed to defend Raymark in "any suit against [Raymark] seeking damages on account of such bodily injury." The fact that an occurrence took place at some time, that bodily injury resulted during a policy period, and that a suit is filed against Raymark on account thereof triggers the insurer's duty to defend. There is nothing in the policy language that permits a reduction in the triggered policy's responsibility to defend "any suit."

Hence, the insurers' own policy language provides that, as between Raymark and its insurers, each carrier is independently responsible to Raymark for the full cost of defense and indemnity. The fact that a policy may contain an "other insurance" clause does not affect the individual insurance company's obligations to the insured. For instance, the "other insurance" clause in Federal's policy provides in relevant part:

"If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for

a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss."

Thus, by its own terms, the clause applies only when a preliminary determination is made that "a loss [is] covered by this policy"—*i.e.*, that the policy is triggered. Only when a policy is triggered and the insurer becomes obligated to pay "all sums" and to defend "any suit" does the "other insurance" clause come into play to allow liability to be apportioned among the insurers. Indeed, other cases have similarly recognized that "other insurance" provisions do not affect the insurer's duty to the insured to provide full defense and indemnification. See, *e.g.*, *Keene Corp. v. Insurance Co. of North America* (D.C. Cir. 1981), 667 F.2d 1034, *cert. denied* (1982), 455 U.S. 1007, 71 L. Ed. 2d 875, 102 S. Ct. 1644; *Lac d'Amiante du Quebec, Ltee. v. American Home Assurance Co.* (D.N.J. 1985), 613 F. Supp. 1549.

We further observe that the automatic *pro rata* allocation in *Forty-Eight Insulations* advocated by Zurich has been criticized and specifically rejected by at least one court (*Sandoz, Inc. v. Employer's Liability Assurance Corp.* (D.N.J. 1983), 554 F. Supp. 257). There, the court aptly observed:

> "[T]he automatic pro rata allocation adopted in *Forty-Eight Insulations* *** may be an appropriate standard in considering claims among the insurers, but not in considering a claim by the insured. ***
>
> *** 
>
> *** [T]he right to such contribution does not reduce their respective obligations to their insured." (Emphasis added.) 554 F. Supp. 257, 266-67.

Similarly in this case, while there may be apportionment as between the various insurers, this fact does not affect each insurer's independently promised duties to Raymark. We note that the trial court has specifically reserved ruling on the rights and obligations as between the various insurer where more than one policy applies to a particular claim, pending the outcome of this appeal. Accordingly, we conclude that the trial court did not err in denying Zurich's motion for a *pro rata* allocation.

## VI

■■ Northbrook argues that the trial court erred in denying its post-trial motion for clarification of its September 29, 1983, order concerning Northbrook's duty to defend. We agree.

Northbrook is an excess insurer of Raymark. One of the ways in which excess and primary coverage can differ is in the payment of the costs of defense against a claim. Primary policies generally impose on the insurer a duty of defense separate from the duty to indemnify the insured against the claim. (*Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 442 N.E.2d 245.) In contrast, courts have recognized that excess policies seldom provide a separate duty to defend. (See *Brownlee v. Western Chain Co.* (1979), 74 Ill. App. 3d 804, 811-12, 393 N.E.2d 515.) Rather than providing a duty to defend, most excess policies require the excess insurer to indemnify the insured for the costs of defense as part of the "ultimate net loss" against which the policy insures. This fact is clear from Northbrook's policies at issue here, which provide in relevant part:

> " 'Ultimate Net Loss' shall mean the total sum which the insured, or the insured's underlying insurance as scheduled, or both, become obligated to pay by reason of Personal Injuries, Property Damage or Advertising Liability claims, either through adjudication or compromise, and shall also include expenses consisting of: hospital, medical, and funeral charges; all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or legal bonds, interest, expenses for doctors, lawyers, nurses, and investigators and other persons; *litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any Occurrence covered hereunder* \*\*\*." (Emphasis added.)

Therefore, under the above policy language, the duty of an excess carrier such as Northbrook is not to provide a defense to the insured, but instead to pay for the *costs* of defense. These costs are applied against the policy limits.

Here, the court heard no evidence on the different character of defense payments under Northbrook's policies. The court's order of September 29, 1983, lumped Northbrook, an excess carrier, with the primary insurers. The order provides in part:

> "Zurich, Commercial Union, Federal, Northbrook and Globe, the insurers of Raymark, Inc., are required to provide coverage and defense as a result of asbestos claims for the period of time a claimant is exposed to asbestos, and the time the disease manifests (i.e. is able to be detected and diagnosed) itself during the respective policy periods."

The order does not specifically state that Northbrook has a duty to defend; however, it fails to specify that Northbrook's obligation is solely to pay for the costs of defense and that those costs are charged

against the policy limits. We hereby modify the order so as to include this specification.

## VII

Finally, we turn to Commercial Union's argument that the trial court erred in determining the existence and coverage of certain policies underwritten in the 1940's by its predecessor, The Employers' Liability Assurance Corporation (ELAC). During the proceedings below, Commercial Union denied the existence of the ELAC policies and Raymark was therefore required to establish their existence at an evidentiary hearing. Following the hearing, the trial court ruled that Raymark had proved that ELAC underwrote products liability coverage reflected in the following three comprehensive liability policies:

(1) ELAC 0 345556
-coverage from February 23, 1947, to February 23, 1950 (limits of $5,000 per person, $10,000 per occurrence, and $15,000 in the aggregate)

(2) ELAC CL 38651
-coverage from May 1, 1944, to May 1, 1945 (limits of $100,000 per person, $300,000 per occurrence, and $300,000 in the aggregate)

(3) ELAC CL 5663
-coverage from May 1, 1941, to May 1, 1944 (limits of $10,000 per person, $20,000 per occurrence, and $50,000 in the aggregate)

Commercial Union now challenges the court's finding as to each of the above policies.

■■■ In Illinois, to prevail in an action to recover against an insurer, the insured must establish that it entered into a contract of insurance. (*Brady v. Illinois Agricultural Mutual Insurance Co.* (1945), 325 Ill. App. 336, 60 N.E.2d 108.) However, the existence of the policy is not a prerequisite to proving a valid contract of insurance since a suit to enforce the liability of an insurer may be brought *on the contract* for insurance as well as on the policy itself. (*Security Insurance Co. v. Mato* (1969), 108 Ill. App. 2d 203, 246 N.E.2d 685.) To hold the insurer liable, it is sufficient if the coverage agreed upon is capable of being ascertained. *Barlow v. Farmers' Mutual Fire Insurance Co.* (1906), 128 Ill. App. 580.

Commercial Union initially raises a "best evidence" rule objection to evidence adduced at trial regarding ELAC 0 345556. Raymark submitted in evidence a complete copy of an original policy of manufacturer's and contractor's liability insurance issued to it, bearing the

number of ELAC 0 345556. The term of the policy is February 4, 1947, to February 4, 1950. The declarations page of the copy bears the stamp "SPECIMEN COPY NOT A VALID POLICY."

■■ Commercial Union's best evidence rule objection to the copy must fail. The best or secondary evidence rule provides that in establishing the terms of a writing, where the terms are material, the original writing must be produced unless it is shown to be unavailable for some reason other than the serious fault of the proponent. (*Lam v. Northern Illinois Gas Co.* (1983), 114 Ill. App. 3d 325, 449 N.E.2d 1007.) To introduce secondary evidence of a writing, a party must first prove the prior existence of the original and its loss, destruction or unavailability, authenticity of the substitute and his own diligence in attempting to procure the original. (*Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 246 N.E.2d 269.) Whether there has been a sufficient foundation for the admission of secondary evidence of the contents of a writing is within the discretion of the trial court. *People v. Bowman* (1981), 95 Ill. App. 3d 1137, 420 N.E.2d 1085.

In this case, Raymark satisfied each of the above foundational requirements. First, it proved through the testimony of its expert, Gerald Waters, that in order for a specimen copy to have existed, there must have been an original sold to the insured. Indeed, Commercial Union's vice-president, Arthur Lind, acknowledged that in order for the specimen copy to have existed, there must have been an original copy. Documentary evidence corroborated the existence of 0 345556; pages from Raymark's insurance ledger for the years 1949 to 1975 indicated that a premium was paid in 1949 to "employers" for the policy number at issue.

Waters also testified that he was "positive" the document in question was a duplicate copy of an original policy prepared by "someone at ELAC." The authentication of the duplicate as a true and correct copy of the original policy was then established through Lind's testimony. Both Lind and another Commercial Union employee, James Roche, testified that the document in question was not a "specimen policy" in the technical sense of that term as a blank policy form for educational purposes or for filing with the State regulatory agencies.

Raymark further proved the "loss, destruction or unavailability" of the original policy through the testimony of its treasurer, John Kutzler. Kutzler testified that the insurance in question was obtained at the initiation of Raymark's Passaic, New Jersey, office through a New York broker, W. Ward Smith. Correspondence admitted into evidence between the comptroller of Raymark in Passaic, New Jersey, and the assistant secretary of Raymark in Bridgeport, Connecticut,

establishes that the policy replaced a Preferred Accident Insurance Company policy providing products liability insurance. The correspondence further shows that the original policy was retained in Raymark's Passaic office, while a copy of the policy was sent to Raymark's Bridgeport office. Kutzler testified that no insurance records from the Passaic offices were ever found and therefore only the copies retained at the Bridgeport offices are available. Additionally, Kutzler stated that Raymark undertook a diligent search of all corporate records maintained by its Passaic and Bridgeport offices and further searched the files of the insurance agencies through whom both the Passaic and Bridgeport offices purchased insurance in the 1940's.

■■ We note that Commercial Union now raises a hearsay objection to the above correspondence. At trial, however, Commercial Union made no objection to the admission of these documents as business records. To the contrary, counsel for Commercial Union acknowledged they were in fact business records. As such, Commercial Union not only has waived any objection to the admissibility of these documents as business records (*Dombrowski v. Laschinski* (1978), 67 Ill. App. 3d 506, 385 N.E.2d 35), but it has specifically concurred with Raymark that such documents were properly admitted under the business records exception to the hearsay rule.

In light of the foregoing testimony and documentary evidence, we cannot conclude the trial court abused its discretion in receiving in evidence the copy of ELAC 0 345556.

■■ Next, Commercial Union challenges the trial court's determination with respect to ELAC CL 38651. It argues that endorsement No. 1 on ELAC CL 38651 effectively excluded products liability as an insured risk and that this policy only provided coverage for automobile liability. We find this argument unpersuasive.

Initially, we note that the policy on its face is a comprehensive liability policy clearly including products liability as a covered risk. The term "COMPREHENSIVE LIABILITY POLICY" is printed in bold characters on the first line of the policy. Additionally, the declaration page recites policy limits for "products" *in addition* to limits for "automobile," "all other" and "property damage liability." Specifically, it recites indemnity limits for "products" coverage of $100,000 per person, $300,000 per occurrence and $300,000 in the aggregate. The declarations page contains no language indicating that products liability is to be excluded. Witnesses for both parties testified that products liability is an included coverage in a comprehensive liability policy unless it is specifically excluded.

We observe that Commercial Union, in arguing that the policy

covers only automobile liability, quotes in its appellant brief only a portion of endorsement No. 1. The endorsement, when read in its entirety as follows, fails to support Commercial Union's position:

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability and Property Damage Liability applies subject to the following provisions:

(1) The insurance applies only to the ownership, maintenance or use of any automobile as defined in the policy;

(2) The insurance does not apply:

(a) to any automobile used by or for an independent contractor or his employees as part of the work to be performed by said independent contractor under a contract or agreement with the named Insured;

(b) the word "work" as used in the preceding paragraph shall not mean the carrying of goods or materials to premises owned, hired or leased by the named Insured or the carrying away of goods or materials after storage, completion of processing or manufacture by the named Insured."

Item (2) of the endorsement, when read together with item (1), makes it clear that the endorsement serves only to define what is a covered automobile and what is a noncovered automobile. This is the only reading of the endorsement which is consistent with the policy when read, as it must be, in its entirety. (*National Discount Shoes, Inc. v. Royal Globe Insurance Co.* (1981), 99 Ill. App. 3d 54, 60, 424 N.E.2d 1166.) To read the endorsement otherwise would make no sense and would directly contradict the declarations page.

In further support of its argument above, Commercial Union relies on the premium computation section of a "survey and application" (survey). Commercial Union alleges that the premium computation in the survey reveals that no premium was charged for ELAC CL 38651 for any of the potential coverage other than automobile liability. Commercial Union's reliance on the survey is misplaced. The uncontroverted testimony established that products liability is a covered risk on a comprehensive liability policy, unless it is specifically excluded, regardless of whether a separate premium is charged. Furthermore, there is nothing in the record to indicate the survey was ever made part of the policy or even signed by the insured. Commercial Union cites no authority to support its contention that the unsigned survey must be read *in pari materia* with a contract of insurance of which it is not a part. We therefore conclude the trial court did not err in finding that ELAC CL 38651 provided products liability coverage.

■■ Lastly, Commercial Union challenges as speculative the trial court's finding that ELAC CL 5663 provided coverage for three years rather than one year. The court determined that the policy provided products liability coverage from May 1, 1941, to May 1, 1944.

We find sufficient evidence to support the court's determination. First, Raymark introduced into evidence the broker's copy of ELAC CL 38651. This document indicated that ELAC had sold a comprehensive liability policy to Raymark which immediately preceded CL 38651 under the number CL 5663. Raymark also presented the testimony of its expert, Gerald Waters, who was working in the insurance industry in the 1940's. Waters testified that in the 1940's, comprehensive general-liability policies were sold for a period of either one year or three years, and that during that time period all original policies were sequentially numbered and consequently serially sold. On that basis, Waters concluded that 33,000 policies were issued between ELAC CL 5663 and CL 38651. Waters testified that it was unimaginable that ELAC had issued 33,000 comprehensive liability policies between CL 5663 and CL 38651 in only one year, and that it was a far more "likely conclusion" that CL 5663 covered a three-year period.

Commercial Union failed to offer any competent testimony to rebut Waters' testimony. Nor did it show that anyone other than ELAC's home office had policy issuance authority in the 1940's. Accordingly, in the absence of any evidence to the contrary, we find no basis to disturb the trial court's determination that ELAC CL 5663 covered a term of three years.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part, modified in part and reversed in part.

Affirmed in part, modified in part, and reversed in part.

CAMPBELL and QUINLAN, JJ., concur.