EVANSTON INSURANCE
COMPANY, Plaintiff,

v.

SECURITY ASSURANCE
COMPANY, Defendant.

No. 85 C 9757.

United States District Court,
N.D. Illinois, E.D.

June 16, 1989.

---

Robert J. Bates, Jr. and Maryann C. Hayes, Phelan, Pope & John, Ltd., Chicago, Ill., for plaintiff.

Hugh R. McCombs, Jr., Michael Gill and Bettina Getz, Mayer, Brown & Platt, Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Evanston Insurance Company ("Evanston") seeks a declaration that the Insurance Companies and Affiliates Errors and Omissions Policy (the "Policy") it issued to Security Assurance Company ("Security") does not cover certain claims made against Security. Evanston has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, its motion is granted.

#### Facts [1] and Prior History

This story begins in 1982, when Martin Levine ("Levine") was President and Chair-

---

**1.** Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Security (*DeValk Lincoln Mercury, Inc. v.*

man of the Board of American Benefits, Ltd. ("American Benefits"). American Benefits was in the business of selling, marketing and administering a multiple employer trust, the American Benefits Trust (Levine Dep. 6)—a medical, dental and life insurance program sold to a group of small employers (generally companies employing anywhere from two to 99 employees) to give them access to competitive rates on such insurance (*id.* 7).[2] American Benefits then had about 70,000 insureds (*id.* 6).

Levine claims that in September 1982 Security agreed to "front" the program for American Benefits (*id.* 8). That would involve Security's issuance of a master insurance policy to American Benefits Trust, providing coverage to all the participants in the group program (*id.*).[3]

On September 23, 1982 Security President Frank Barrett ("Barrett") telexed Levine that Security was withdrawing from negotiations and would not agree to issue the policy covering participants in the American Benefits Trust programs (12(*l*) ¶ 13[4]). Next day Levine responded with this telex (12(*l*) App. J[5]):

> This is to advise that ABL [American Benefits] finds SACS [Security's] notice of termination of major medical coverage for the ABT [American Benefits Trust] communicated to Global Surplus and Whitcomb Surplus to be totally unacceptable.
>
> Security has entered into a binding contract with American Benefits to provide major medical coverage to the American Benefits Trust for a period of three

months effective August 1, 1982 and terminating October 31, 1982. There is ample evidence to prove the existence of this agreement, which is most recently referred to in letters from Security's President Frank J. Barrett, dated September 14, 1982 to Martin Levine, President of American Benefits and to John Faber, General Counsel for the California Department of Insurance.

> This will serve as notice that: 1) all conditions precedent to this contract have been met 2) a binding contract is in effect 3) American Benefits stands ready, willing and able to perform under the contract and 4) American Benefits will hold Security directly liable for any resulting damages if the terms of the contract are not specifically performed by Security.

Barrett acknowledges receiving that telex (12(*l*) ¶ 14). Later that same day Barrett also received this telex (12(*l*) App. K) from Edward Hurley ("Hurley"), President of American Diversified Life Insurance Company ("American Diversified")[6]:

> This is to advise that American Diversified Life Insurance Company will hold Security Assurance Company directly liable for any damages sustained by American Diversified Life Insurance Company as a result of Security Assurance Company's breach of contract with American Benefits Limited.

Still on September 24 (a busy day indeed) Levine called Evanston Executive Vice President Paul Bonn ("Bonn") (12(*l*) ¶ 16).

---

*Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987)).

2. Like all group insurance, the multiple employer trust is intended to provide the benefits of economies of scale.

3. Levine explained such an arrangement was necessary to comply with a 1981 California law requiring that the program's insurance carrier be licensed in the state of California (*id.*). American Benefits was not, but Security was.

4. This District Court's General Rule 12(*l*) requires a party moving for summary judgment to submit a statement of material facts as to which there are no genuine issues (Evanston's statement here is cited simply "12(*l*) ¶—" or "12(*l*)

App.—"). General Rule 12(m) then requires the nonmovant to respond by admitting or controverting each paragraph of the movant's statement. Citations to Evanston's statement here are to paragraphs admitted by Security's response. Citations to Security's own statement take the form "12(m) App.—."

5. Although this and the next telex were entirely in capital letters, this opinion has reproduced them in conventional type for easier reading.

6. Apparently American Diversified is affiliated with American Benefits, but the parties do not specify just how (12(*l*) ¶ 15).

Following that conversation, Bonn prepared this file memorandum (12(*l*) App. L):

I received a telephone call from Martin Levine, President of the captioned company, regarding our wire yesterday terminating negotiations with his company for a book of major medical A & H in California. Mr. Levine was upset at our decision to terminate negotiations and intimated that several lawsuits involving the parties would follow. He expressed the hope to avoid those legal costs by having us reconsider our decision and accept the risk as it had been proposed earlier.

I reiterated our position to Mr. Levine that we did not have a contract in force with his company. I also stated that it was highly unlikely that we would reconsider our business decision and I was sorry he felt the need for a lawsuit but that he should do whatever he feels is necessary and we will do the same. He asked that I convey his feelings to Frank J. Barrett, which I have done and we will await further developments.

Barrett reviewed that memorandum the same day. Barrett also advised Security Vice Chairman Robert Godfrey ("Godfrey") of Levine's telex not later than September 30 (12(*l*) ¶ 18).

On October 12 Bonn received a call from Claude Dorais ("Dorais"), a lawyer representing several entities (agents) that had placed business with American Benefits in the belief that Security was the carrier (Dorais Dep. 16; Bonn Dep. 68–69). Dorais told Bonn that if his information was correct "Security was clearly on the risk" (Dorais Dep. 17). Bonn denied any liability and reported the conversation to Barrett (Bonn Dep. 69).

Dorais then wrote to Bonn on October 20, outlining why he believed Security was responsible. He added (12(*l*) App. M):

From the information I have, it appears to me that Security Assurance and its parent, Central National, are responsible for claims incurred under the ABA program of benefits for the period of time commencing August 1, 1982, through October 31, 1982.

\* \* \* \* \* \*

Based on the information which I have, it seems that Security is on the risk and that any delay by Security in fulfilling its obligations only increases the ultimate cost to Security.

I recognize that you may disagree with my conclusion or my analysis in that there may be additional facts of which I'm not aware. That's why I called you in the first place and that's why I'm anxious to talk to your counsel. There are thousands of participants out here in California, Mr. Bond [sic], that are being pursued by hospitals, physicians, and other providers of medical services for bills which they never thought they would have to pay. All of these participants are potential plaintiffs and it seems to me that it is in our mutual best interests to proceed quickly to consider the validity of these claims and the obligations Security Assurance has.

On October 25 Security's outside counsel Arthur Karma ("Karma") responded to Dorais' letter. Karma denied Security was in any way liable. He said no contract between Security and American Benefits existed because:

1. several express conditions precedent had not been met and

2. American Benefits had made "major material misrepresentations" during the negotiations.

Karma concluded (12(*l*) App. N, at 3):

Please take notice therefore that [Security] will vigorously defend any actions which are brought against it as well as pursuing any claims for affirmative relief to which it feels it is entitled.

On October 25 the *Los Angeles Times* published an article identifying several insurance companies, including Security, that might be liable to American Benefits' participants. Bonn was quoted in that article, a copy of which he received on October 25 (12(*l*) ¶ 24 and Apps. O, P).

Barrett admits that as of October 25 he "would not have been surprised to see

someone try to force [Security] to perform under what they alleged to be the contract" (12(*l*) ¶ 25). In fact, it was admittedly before October 29 that Barrett specifically discussed with Godfrey the possibility of a lawsuit arising out of the American Benefits matter (12(*l*) ¶ 26).

On October 29 Godfrey signed the application (the "Application") on Security's behalf requesting issuance of the Evanston Policy. Among the questions Godfrey answered were these (12(*l*) App. A):

10. If insurance had been in force similar to that proposed under this Part of the Application, no claim(s) which would have fallen within the scope of such insurance has (have) been made or is (are) now pending against any person(s) or entity(ies) proposed for this insurance except as follows: (If answer is NONE, so state.)

None

\* \* \* \* \* \*

12. No person(s) or entity(ies) proposed for this insurance is (are) cognizant of any act, error, or omission which he (they) has (have) reason to suppose might afford valid grounds for any future claim(s) such as would fall within the scope of the proposed insurance, except as follows: (If answer is NONE, so state.)

None

Godfrey also represented on Security's behalf that (*id.*):

14. No fact, circumstance or situation indicating the probability of a claim or action against which indemnification is or would be afforded by the proposed insurance is now known by any person(s) or entity(ies) proposed for this insurance other than that which is disclosed in this Application. It is agreed by all concerned that if there be knowledge of any such fact, circumstance or situation, any claim subsequently emanating therefrom

shall be excluded from coverage under the proposed insurance.

15. The undersigned authorized agent of the person(s) and entity(ies) proposed for this insurance for the purpose of this Application declares that to the best of its/his knowledge the statements herein are true; and it is agreed that this Application shall be the basis of the contract and be deemed incorporated therein should the Insurer evidence its acceptance of this application by issuance of a policy. This Application will be attached to and become a part of such policy, if issued.

Evanston then issued the Policy, providing coverage for errors and omissions claims first made against Security between October 1, 1982 (so that the Policy was partially retroactive) and October 1, 1985. On April 27, 1984 the bankruptcy trustee for American Benefits Trust sued Security in *Diamant v. Security Assurance Co.*, No. CA 000843 (Los Angeles Super.Ct.) (*"Diamant"*), alleging Security had agreed to insure it.[7] On May 14, 1985 Security notified Evanston of the *Diamant* claim and requested Evanston both to indemnify it for any losses and to pay defense costs.

Those are the facts leading up to this long-pending lawsuit: On November 19, 1985 Evanston denied coverage and brought this declaratory judgment action. As for this opinion, it marks the fourth issuance of a substantive opinion in this case, the first two having been written by this Court's former colleague, Honorable Bernard Decker, and the third ("Opinion III," 684 F.Supp. 1423 (1988)[8]) by this Court. Although Opinion III–1424–25 outlines the case's prior history, a brief recapitulation will help to explain exactly what issue the current motion addresses.

Evanston's Amended Complaint (the "Complaint") included two counts, which

---

7. That action is still pending.

8. Citations to Opinion III will take the form "Opinion III—," referring to its page number but omitting the volume number in F.Supp. This opinion is not self-contained in one respect: It will continue to employ the terminolo-

gy used in Opinion III without repeating those defined terms. Citations to Judge Decker's opinions will take the form "Opinion I—" and "Opinion II—," referring to the pages in those slip opinions. Opinion I, 1986 WL 13223, is available on LEXIS.

Judge Decker characterized this way in Opinion I–1–2:

> Count I of the amended complaint seeks a declaration the Policy does not cover SAC's defense costs incurred in the *Diamant* action. Count II asks the court to declare that should the *Diamant* court determine SAC reached an insurance agreement with ABT, then the Policy will not impose upon Evanston a duty to indemnify SAC for any resulting claims.

Judge Decker dismissed Count II for lack of a case or controversy, so it no longer plays a role here. Only Count I—the claim Judge Decker characterized as relating to Security's defense costs—is at issue now.

Judge Decker's Opinion II–6–7 held the Policy did obligate Evanston to reimburse Security for defense costs if the underlying claim was covered by the Policy, but Evanston had no duty to pay those costs as they were incurred. After the case was reassigned to this Court's calendar, it issued Opinion III disposing of Security's estoppel defense. Most recently, this Court's June 21, 1988 oral ruling held (1) Count I does present a live case or controversy and (2) Security would be entitled to reimbursement of its defense costs under the Policy if (June 21, 1988 Tr. 7):

> (a) the *Diamant* litigation is a "claim" within the Policy coverage and
>
> (b) that claim was first asserted during the Policy period and was not known to Security before the Policy period.

Evanston's current motion targets the latter two issues, though somewhat finer tuning of the legal questions is required for resolution of the motion. This opinion now turns to that task.

### *Relevant Policy Provisions*

As stated earlier, the Policy provides "claims-made" coverage.[9] Evanston agrees (Policy, Coverage ¶¶ 1, 5):

> To pay on behalf of the ... Insureds the amount of Loss in excess of the deductible amount ... which such Insureds shall become legally obligated to pay resulting from CLAIMS FIRST MADE AGAINST THE ... INSUREDS DURING THE POLICY PERIOD by reason of any act, error or omission by the ... Insureds in the performance of Professional Services.
>
> PROVIDED ALWAYS THAT ... such act, error, omission, misstatement, misleading statement, neglect or breach of duty, breach of responsibility, obligation or duty happens:
>
> (a) during the Policy Period, or
>
> (b) prior to the Policy Period, provided that on or prior to the effective date of this part of the Policy no executive officer or director of the Insured has knowledge of such act, error, omission, misstatement, misleading statement, neglect or breach of duty, breach of responsibility, obligation or duty.

"Loss" is specially defined (*id.* ¶ 11):

> **Loss** means, whenever used in this part of the Policy, compensatory damages, punitive damages, settlements, and Claim Expenses incurred by the Insured provided always that loss shall not include (a) fines, or penalties imposed by law; (b) taxes; (c) any obligation assumed by the Insured as an insurer or reinsurer under any policy or contract or treaty of insurance, reinsurance, suretyship, annuity, or endowment; (d) the return or payment of premium or commission monies; (e) benefits paid or payable to a participant of or beneficiary of the Employee Benefit Plan if benefits are or may lawfully be paid by the Employee Benefit Plan; (f) contributions paid or payable to the Employee Benefit Plan pursuant to any obligation of the entities referred to in Part 1, Section THE INSURED 4(a) and (b) to fund the Employee Benefit Plan, or (g) matters which are uninsurable under the law pursuant to which this Policy shall be construed.

---

9. For a comparison between claims-made and occurrence coverage, see this Court's explanation in *National Union Fire Insurance Co. v. Continental Illinois Corp.*, 673 F.Supp. 300, 303– 04 (N.D.Ill.1987) and the analysis in Keeton and Widiss, *Insurance Law* ("Keeton") § 5.10(d)(3), at 598 (student ed. 1988).

"Claim expenses incurred by the insured" is also a defined term (*id.* ¶ 9):

> **Claim Expenses Incurred by the Insured** means, whenever used in this part of the Policy, costs, costs of investigation, and amounts incurred by the insured in the defense of legal actions, claims or proceedings and appeals therefrom, cost of attachment or similar bonds; provided always that "Claim Expenses Incurred by the Insured" does not include (i) salary charges of employees or officials of the entities referred to in Part 1, Section THE INSURED 1(a) or (b), 2(a) or (b), 4(a) or (b), or 5(a) or (b), or the Employee Benefit Plan, or (ii) salary or administration or overhead charges, or charges of any kind or character whatsoever attributable to any in-house counsel for the entities referred to in Part 1, Section THE INSURED 1(a) or (b), 2(a) or (b), 4(a) or (b), or 5(a) or (b), or the Employee Benefit Plan.

Those Policy provisions, plus the portions of the Application quoted earlier in this opinion, are relevant to resolution of the current motion.

### Contentions of the Parties

Evanston Mem. 10 says the Policy does not provide coverage for the *Diamant* action for two reasons:

1. Policy Coverage ¶ 1 was inapplicable by its terms because "claim was first made against Security with respect to the facts underlying the *Diamant* action prior to the October 1, 1982 inception date of the Policy."

2. Security had notice of facts and circumstances indicating the probability of the *Diamant* action and failed to disclose that information in the Application as required by its Paragraphs 12 or 14 or both.

Security responds that both of Evanston's arguments are wrong as a matter of law or, at a minimum, present disputed issues of fact. More specifically Security asserts (Mem. 2):

1. None of the September 1982 communications constitutes a "claim" as properly defined.

2. Even if the September 1982 demands were to be considered a "claim," they simply charge a breach of an insurance contract—a claim specifically excluded from coverage under subparagraph (c) of the Policy's definition of "Loss."

3. Both provisions of the Application on which Evanston relies required Security's officers to make subjective evaluations about whether a "claim" within the proposed Policy coverage was probable.

4. Even on an objective basis, the facts do not reveal that Security had knowledge of the probability of a claim before signing the Application.

### Analysis of the Parties' Contentions

#### 1. Initial "Claim" Against Security

Evanston contends one (or more) of the demands made upon Security before October 1 constitutes a "claim" antedating the Policy's coverage:

1. Levine's September 23 telex to Barrett;

2. Hurley's September 24 telex to Barrett; and

3. Levine's September 24 call to Bonn.

Because the Policy does not itself define "claim," it is necessary to look elsewhere to give meaning to that term.

Ordinarily the law places the risk of non-definition on the insurer (*National Union*, 673 F.Supp. at 304 & n. 10). Evanston R.Mem. 7–8 says that rule is inapplicable here because (quoting Opinion III–1427) "Security is itself an insurance company, by definition familiar with the law of insurance, and it was represented at all times by counsel." As Evanston would have it (R.Mem. 7–8, footnote omitted):

> [A]n emerging body of law in Illinois recognizes that the sophisticated insured that is advised and assisted by counsel should not be afforded any preferential treatment under the law.

While that exception might make good sense, Evanston proffers no Illinois cases to evidence such an "emerging body of

law." [10] Each case it does cite—*Hartford Accident and Indemnity Co. v. Gulf Insurance Co.*, 776 F.2d 1380, 1383 (7th Cir. 1985) and *Ohio Casualty Insurance Co. v. Rynearson*, 507 F.2d 573, 578–79 (7th Cir. 1974)—merely applied a high standard for the tender of defense of a claim to an insurance company where the insured was a sophisticated non-individual. This Court's own research has found no Illinois case indicating a general exception to otherwise-applicable legal rules simply because the insured happens to be an insurance company. And of course it is not this Court's role to speculate on inchoate or nonexistent trends in state law (*Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987)).

■ But this Court need not launch on such uncharted seas. What was said in *National Union*, 673 F.Supp. at 306 (footnote omitted) is equally true here:

> Though the Policy does not define "claim" as such, that concept offers no mystery here.

Clearly the Policy uses the term "in its common (and common sense) usage: an effort by a third party to recover money from the insured" (*id.* at 307 n. 17). That usage conforms to the garden-variety dictionary definition of "claim" (*Black's Law Dictionary* 224 (5th ed. 1979)):

> Demand for money or property, e.g. insurance claim.[11]

Thus Application ¶ 9(a) required Security to list "any errors and omissions claims ... in the last five years." [12] Security was directed to:

> Include current status of claim (paid or outstanding), amount requested or awarded, and jurisdiction.

That tracks with the concept of a claim as a current "demand for money or property." In like manner, Policy's "Notice of Claim" provision required Security to "immediately forward to the Insurer ... every demand, notice, summons or other process received" (Policy, Claims ¶ 1)—a requirement similarly equating "claim" with "demand."

■ It is really unnecessary to follow the parties on their extended excursion through the cases and generalized legal rules in their efforts to define "claim" in a way most favorable to their respective positions. Evanston's primary reliance on *Mt. Hawley Insurance Co. v. Federal Savings & Loan Insurance Corp.*, 695 F.Supp. 469, 479–80 (C.D.Cal.1987)—a case applying California law—is unpersuasive on the facts here. On the other side of the coin, Security's attempted reliance on its own "reasonable expectations" as to the scope of coverage (Mem. 10) runs afoul of *Zurich Insurance Co. v. Northbrook Excess and Surplus Insurance Co.*, 145 Ill.App.3d 175, 192, 98 Ill.Dec. 512, 523, 494 N.E.2d 634, 645 (1st Dist.1986) (citing cases), *aff'd*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987):

> The "reasonable expectations" doctrine is not recognized in Illinois.[13]

---

**10.** This Court has previously determined Illinois law controls here (Opinion III–1425 n. 7).

**11.** [Footnote by this Court] See also *Webster's Third New International Dictionary* 414 (1976): a demand for compensation, benefits, or payment ( ... one made under an insurance policy upon the happening of the contingency against which it is issued ...).

**12.** Application ¶ 15, quoted earlier in this opinion, makes the Application a part of the Policy.

**13.** [Footnote by this Court] Nor do Security's other arguments advance the analysis to any degree:

> 1. It goes to great lengths to show Evanston is, in general, a poor draftsman. Security Mem. 11 urges this Court to note that Evanston has in the past also failed to define policy terms (*Evanston Insurance Co. v. International Manufacturing Co.*, 641 F.Supp. 733 (D.Wyo.1986) (terms "accident" and "occurrence" not defined). Only one characterization of that argument is appropriate: irrelevant.
>
> 2. Security Mem. 16–19 points to Evanston policies issued later than the Policy here—policies expressly defining "claim," generally as "a demand for money or the institution of a lawsuit." But of course those later contracts with other insureds do not bear on the meaning intended in *this* Policy (it might equally be argued the later policies connote intended differences in meaning, rather than the identical meaning).
>
> 3. Security Mem. 14–15 argues that in the past Evanston has taken positions inconsistent with its current posture. In the absence of some issue-preclusive or estoppel effect

■ What *is* relevant here is that clearly none of the three September 1982 communications qualifies as a "demand for money or property." After all, American Benefits had not been damaged in any way on September 23–24. What Security was being told, in no uncertain terms, was that it would be held liable for any possible *future* damages flowing from its refusal to honor its commitment. But such a warning (or even threat) of a possible future suit, at least framed in the way the communications went to Security, does not qualify as a present "claim."

■ By contrast, the *Diamant* action is unquestionably a "claim"—a demand for money damages in the underlying American Benefits matter. Such a lawsuit is the paradigmatic example of a "claim" as that term is used in the Policy. And because *Diamant* was filed April 27, 1984, that claim was first made during the Policy period. That being so, Evanston is liable for Security's costs in defending *Diamant*[14] unless Security's knowledge at the time of the Application blocks such liability.

### 2. *Security's Knowledge at the Time of the Application*

■ Evanston contends Application ¶¶ 12 and 14 were misrepresentations in light of the same September 1982 communications that immediately preceded the Policy's effective date and were still fresh when Security signed the Application. Security's principal retort is that those paragraphs called for subjective evaluations on its part, thus posing factual issues incapable of resolution on a Rule 56 motion.

It will be recalled that Application ¶ 12 asks if Security is aware of any acts or omissions that Security "has reason to suppose might afford valid grounds for any future claim(s) such as would fall within

the scope of the proposed insurance." And Application ¶ 14 says Security knew of "[n]o fact, circumstance or situation indicating the probability of a claim against which indemnification is or would be afforded by the proposed insurance."

Security seeks to draw support for its position almost exclusively from *Citizens Bank of Jonesboro, Arkansas v. Western Employers Insurance Co.*, 865 F.2d 964 (8th Cir.1989). In *Citizens Bank*, as here, the court had to evaluate the insured's disclosure in light of the situation existing at the time of the insurance application. Applying Arkansas law, the court said (*id.* at 966) (citations omitted):

> The language of question 24 calls for the applicant's belief about whether any known fact or circumstance might give rise to a future claim. The question thus contains a judgmental component and implicitly acknowledges the lack of absolute certainty in the answer.... The [district] court correctly recognized in its consideration of question 24 that when a question calls for an answer based on interpretation of known facts and circumstances, as distinguished from a simple disclosure of historical facts, the response is measured under Arkansas law by whether the individual answering the question was justified in the belief expressed.

Security Mem. 23 argues that based on the *Citizens Bank* analysis, the critical fact issue here is Security's subjective belief when it completed the Application. And on that score Security says a material factual dispute exists—both Barrett and Bonn testified they did not believe *any* suit (either a contract or an errors and omissions claim) would ensue:

---

(neither present here), that can at worst give rise to a charge of opportunistic advocacy—scarcely a basis for a definitive legal ruling against Evanston. Perhaps Evanston's counsel are drawing on the teaching of that eminent legal scholar, Ralph Waldo Emerson (Essays: First Series [1841], *Self-Reliance*):
A foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines.

But in any event, as the text has explained and will explain, the definition of "claim" (a) does not pose any real difficulty and (b) need not be fine-tuned to resolve the issues on the current motion.

**14.** Evanston does not dispute that the *Diamant* claim comes within the Policy coverage (*Diamant* alleges a tortious breach of duty as its Third Cause of Action, see 12(*l*) App. S).

1. Barrett said (12(m) App. 1, at 63–65, 74–78):

(a) He knew American Benefits was insolvent.

(b) American Benefits had made a number of misrepresentations, and he did not believe it would want those misrepresentations exposed in court.

(c) Conditions precedent to the Se-curity–American Benefit contract had not been satisfied.

2. Bonn testified he saw no suit aris-ing because American Benefits was go-ing into liquidation (12(m) App. 2, at 61–62) and he did not believe Levine would actually file a lawsuit (*id.* at 56).

This Court rejects Security's basic prem-ise that its subjective corporate mindset is the standard set by the Application. Appli-cation ¶ 14 calls for no judgmental or sub-jective evaluation, but in traditional objec-tive language requires the disclosure of any facts indicating the probability of a covered claim. As for Application ¶ 12, though its reference to "valid" grounds may be problematic in a quite different sense,[15] its "reason to suppose" language plainly establishes a "reasonableness" standard (as in "reasonable person").[16] On that score the Illinois law of claims-made errors and omissions insurance is crystal-clear (*Stiefel v. Illinois Union Insurance Co.*, 116 Ill.App.3d 352, 356, 72 Ill.Dec. 141, 143–44, 452 N.E.2d 73, 75–76 (1st Dist. 1983) (citations omitted):

> In the case at bar, the policy excludes all acts prior to the policy period unless "claim is first made during the Policy period" and "providing no insured had knowledge nor could have reasonably forseen [sic] any circumstance which might result in a claim at the effective date of the Policy * * *." Thus, the policy clearly and unambiguously pro-vides that a claim must actually be made during the policy period. Additionally, the insured must not have knowledge of circumstances occurring prior to the poli-cy period from which a claim might rea-sonably have been foreseen. Therefore, the fundamental issue before this court is whether the letter of December 22, 1976, constitutes sufficient notice to plaintiff from which it could have reason-ably been foreseen that a claim would be made against the plaintiff.

> \* \* \* \* \* \*

> Plaintiff argues his allegation that he "reasonably believed" any possible claim had been forsaken and abandoned, should be accepted as a properly pleaded fact. We disagree. "Reasonableness" is a conclusion, and is therefore not admit-ted as true in a motion for judgment on the pleadings.... A court may deter-mine an issue of reasonableness as a matter of law if the facts are not in dispute....[17]

---

**15.** While Application ¶ 14 speaks only of a claim falling within Policy coverage (and such a claim might of course be a loser and still entitle Secur-ity to be paid for its defense costs), Application ¶ 12's reference to "valid grounds" for a claim might be read to suggest the potential claim would have to be a prospective *winner* before Security could be left naked by its failure to disclose the matter in the Application. But even if that were so, that would still not make Securi-ty's *subjective* judgment on that score the test for whether disclosure is required. Once again Application ¶ 12 asks whether the insured has "reason to suppose," and under that language no insured could hide behind an unreasonable os-trichlike failure to recognize an incipient claim.

**16.** Because this Court finds the Application sets objective rather than subjective standards, *Citi-zens Bank* is inapropos here. But even if the *Citizens Bank* approach were to be credited, it could never be said that Application ¶ 14 calls for a subjective evaluation. Thus, for example, there is no quarrel as to what Security *knew* at the time of the Application, and Application ¶ 14 makes the test whether the known facts indi-cated the probability of a covered claim—a clas-sic objective criterion.

**17.** This unambiguous statement of Illinois law is all of a piece with the general principle that the reading of contracts is normally a search for the objective meaning of the language used, not what one contracting party *now* says it had in mind but did not communicate to the other party (see the classic "twenty bishops" statement by Honorable Learned Hand in *Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (S.D.N.Y.1911)). And of course it cannot be ignored that a litigant's current statement of its alleged frame of mind at an earlier date comes *after* a dispute has already arisen—so that a court has reason to be concerned lest the state-ment of purported current recollection may be the product of wishful thinking or worse.

And it should be emphasized that Security's misrepresentation in *either* Application ¶ 12 or ¶ 14 is enough to bar Evanston's liability under the Policy as to the claim involved in that misrepresentation.

 From an objective standpoint, there can be no doubt that when Security applied for insurance it knew of facts presaging what ultimately erupted as the *Diamant* claim. It is unnecessary to repeat the evidence, for at least two communications squarely put Security on notice:

1. Levine's telex and call to Security on September 23–24 clearly warned of an impending claim.

2. Dorais' communications expressly warned Security was "on the risk."

Indeed, Security personnel themselves confirmed their awareness of such a potential claim:

1. Karma told Dorais Security would "vigorously defend any actions."

2. Barrett admits he "would not have been surprised to see someone try to force [Security] to perform" the alleged American Benefits contract.

3. Barrett discussed with Godfrey the possibility of a lawsuit arising from the American Benefits matter.

 In the face of all that evidence, Security still argues that even on an objective standard it did not have notice indicating the probability of a covered claim. Security asserts that at most the American Benefits dispute amounted to a breach of an insurance contract—something excluded from coverage by the definition of "Loss."

That really distorts the policy exclusion on which Security relies—one that denies coverage for "any obligation assumed by the insured as the insurer ... under any policy ... of insurance...." In this case Security *never issued* an insurance policy. Indeed the very gravamen of the prospective claims known to Security but not disclosed to Evanston in the Application (the prospective claims that ultimately ripened into the *Diamant* lawsuit) was Security's *nonissuance* of a policy—its *nonassumption* of "any obligation ... as the insurer ... under any policy." Security's asserted excuse for nondisclosure really stands the Policy exclusion on its head.

Security is really trying to play both ends against the middle. It first argues that at the time it completed the Application it had no knowledge of a covered claim. It then does an about face and contends that the claim as posed in *Diamant* is covered by the Policy.[18] Evanston is prepared to accept the second proposition, but it understandably rejects the first. Security cannot have it both ways. This Court finds that under the undisputed facts of this case Security cannot reasonably as-

---

Judge Easterbrook's recent opinion in *Empro Mfg. Co. v. Ball-Co Mfg., Inc.,* 870 F.2d 423, 425 (7th Cir.1989) (affirming this Court's decision), though addressing a different issue of contract construction, is worth repeating:

> Contract law gives effect to the parties' wishes, but they must express these openly. Put differently, "intent" in contract law is objective rather than subjective—a point *Interway* [*Inc. v. Alagna,* 85 Ill.App.3d 1094, 41 Ill.Dec. 117, 407 N.E.2d 615 (1st Dist.1980) ] makes by holding that as a matter of law parties who make their pact "subject to" a later definitive agreement have manifested an (objective) intent not to be bound, which under the parol evidence rule becomes the definitive intent even if one party later says that the true intent was different. As the Supreme Court of Illinois said in *Schek v. Chicago Transit Authority,* 42 Ill.2d 362, 364, 247 N.E. 2d 886, 888 (1969), "intent must be determined solely from the language used when no ambiguity in its terms exists."

**18.** Security rationalizes that inconsistency by labeling the potential claim threatened at the time of the Application as a contract claim (and hence allegedly uncovered), while *Diamant* combines such a contract claim with a tort-based claim (its Third Cause of Action charges a tortious breach of the duty of good faith and fair dealing) and is therefore covered. But that distinction really does not hold water. Both in September 1982 and in the *Diamant* complaint the charge was that Security had wrongfully dishonored its commitment to provide insurance—something very different from its failure to pay out on an already-issued policy, in the sense of the quite understandable exclusion of the latter from an errors and omissions policy issued to a company whose business is writing insurance. It can scarcely be gainsaid that Security was well aware of material facts that would materially affect Evanston's risk (at least on the premise that such a claim was potentially covered by Evanston's policy), that it failed to disclose those facts to Evanston and that it is now seeking to sandbag Evanston on the known but undisclosed exposure to that claim.

sert it lacked knowledge of facts that should have been disclosed in the Application and now form the predicate for the *Diamant* litigation.[19]

### Conclusion

None of the September 1982 communications themselves constituted a "claim" as that term is used in the Policy. That means the *Diamant* action is a "claim" that was first made during the Policy period. However, Security clearly had knowledge before the Policy period of facts that fell within the scope of Application ¶¶ 12 and 14 and that were later at the core of that *Diamant* claim.

There is no genuine issue of material fact and Evanston is entitled to a judgment as a matter of law. This Court declares that Evanston has no obligation under the Policy to pay Security's defense costs incurred in the *Diamant* action. Because that issue is the only present "case or controversy" between the parties, this ruling disposes of all claims within this Court's subject matter jurisdiction and is therefore the final order in this action.

19. It is therefore unnecessary to address the suggestion at Evanston Mem. 24–25 that Security should be held to a higher standard of disclosure because it is an insurance company (as suggested in Keeton § 5.8(d), at 577–78). Evanston has cited no Illinois cases adopting such a rule, while Keeton cites only one Iowa case and acknowledges (*id.* at 577):

> Thus far, few judicial precedents have addressed this question.