CHICAGO INSURANCE COMPANY,
Plaintiff,

v.

Frank HALCOND, RN,
et al., Defendants.

No. 98 Civ. 4528 (LAK).

United States District Court,
S.D. New York.

May 21, 1999.

Nancy D. Lyness, White, Fleischner & Fino, New York City, for plaintiff.

Phillip J. Murphy, DePodwin & Murphy, New York City, for defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This is an action to declare that (1) a policy of insurance issued to defendant Frank Halcond is void *ab initio* and may be rescinded, and (2) the plaintiff is not obligated to defend Halcond in two personal injury cases brought against him. Discovery having been completed, plaintiff moves for summary judgment.

### Facts

#### The Initial Application

Frank Halcond has practiced as a nurse/anesthetist since 1970.

On March 26, 1996, he applied to plaintiff Chicago Insurance Company ("Chicago") for an Individual Nurse Anesthetist Professional Liability claims-made policy for the period April 1, 1996 to April 1, 1997. Question 4 on the form was captioned "professional title" and provided two boxes, one for "CRNA" (doubtless an acronym for certified registered nurse anesthetist although that is not made clear on the application form) and the other for "student nurse anesthetist" as well as a blank in which to insert the applicant's number of years in practice. Halcond check the CRNA box. In addition, he added the letters CRNA after his signature at the end of the application. Chicago duly issued the policy.

### The Gomez and Bourodimos Incidents

On September 23, 1996, Halcond served as the nurse-anesthetist under the direction of a physician during a surgical procedure performed on Francisca Gomez at the Queens Women's Medical Services Center. A catastrophic event occurred. Ms. Gomez was taken to Elmhurst Hospital but resuscitative efforts failed and she remains in an irreversible coma/persistent vegetative state. It is undisputed that Halcond did not notify Chicago of the incident prior to being sued more than a year later.

On March 20, 1997, Halcond served as the nurse-anesthetist under the supervision of another physician during a plastic surgery procedure performed on Angela Bourodimos. Another catastrophic event occurred. Ms. Bourodimos became unresponsive and was rushed to New York Hospital. Apart from the inference to be drawn from the fact that she is represented here by her mother and court-appointed guardian in consequence of her mental incompetence, the record before this Court is silent as to the outcome in her case. In any event, Halcond did not notify Chicago of this incident either before he was sued many months later.

*The 1997–98 Renewal Application*

On March 26, 1997, Halcond applied for renewal of the Nurse Anesthetist Professional Liability claims-made policy for the period April 1, 1997 to April 1, 1998. In response to a question on the application form whether any facts or circumstances had occurred in the past year "that might give rise to a claim or suit," Halcond checked "No."

*The* Gomez *and* Bourodimos *Lawsuits*

In December 1997, personal injury suits were brought by Gomez and Bourodimos' guardian against Halcond and others allegedly involved in the incidents allegedly resulting in their injuries. Halcond was served with the *Gomez* complaint on December 22, 1997 and the *Bourodimos* complaint on January 21, 1998. Although Halcond claims to have given telephonic notice to Chicago's "agent/broker" and to have forwarded the pleadings to Chicago by mail, he concedes that the mailings were returned. It is undisputed that Chicago first learned of these actions on March 13 (*Bourodimos*) and March 23, 1998 (*Gomez*).

*The 1998–99 Renewal*

The record does not contain Halcond's application to renew his policy for the April 1, 1998 to April 1, 1999 year. Nevertheless, it is undisputed that Chicago renewed the policy for that additional one year term on April 3, 1998.

*Subsequent Events*

On May 8, 1998, Chicago issued a disclaimer to Halcond with respect to the *Gomez* and *Bourodimos* claims. The letter makes clear the carrier's view that Halcond's March 1997 statement in the first renewal application that nothing had occurred in the preceding year "that might give rise to a claim or suit" was materially false given his knowledge of the Gomez and Bourodimos incidents. Further, it asserted that the policy was "deemed void as of its inception" and recited that the broker was forwarding a check to Halcond under separate cover for the full amount of the premium he had paid. In addition, the letter contended that Halcond had breached his obligation to forward the pleadings in the *Gomez* and *Bourodimos* cases to Chicago "as soon as practicable" and that Chicago was not obliged to defend or indemnify Halcond on that ground as well.[1]

Some time in May 1998, it came to Chicago's attention that Halcond was not a certified registered nurse anesthetist at the time of or subsequent to his application for the policy. It now is undisputed that his certification expired on July 31, 1988.[2]

On June 23, 1998, Chicago commenced this action seeking a declaration that it is not obliged to defend or indemnify Halcond in the *Gomez* and *Bourodimos* cases on the grounds that (1) the 1997–98 policy is void *ab initio* in consequence of his concealment and affirmative misrepresentation of material facts in the procurement of the original policy and the renewal, viz. the false assertion in the original application that he was a CNRA and the negative response in the renewal application to the question about incidents that might give rise to claims, and (2) he failed to provide timely notice of the *Gomez* and *Bourodimos* occurrences and lawsuits.[3]

On December 16, 1998, Halcond was sued yet again in consequence of a catastrophic incident that occurred during the 1998–99 renewal term and that resulted in the death of a patient (the *Stewart* case). He promptly notified Chicago of the action. But on January 27, 1999, Chicago disclaimed any obligation to defend or indemnify him with respect to the *Stewart* case. The disclaimer relied upon the alleged misrepresentation in the original policy application of Halcond's CRNA status, asserted that the 1998–99 renewal

---

1. Lyness Aff.Ex. P.

2. Mattes Aff. ¶ 2.

3. The plaintiffs in the underlying actions have been joined as defendants in this case. They have not responded to the motion.

policy was void as of its inception, and recited that Halcond's premium was being returned. The letter asserted also that Halcond failed to comply with the policy provision requiring prompt notice of the incident that gave rise to the *Stewart* claim.[4]

For reasons that are not clear on the record, Chicago's counsel in this case wrote to Halcond again on March 3, 1999 summarizing the carrier's position with respect to all three underlying claims as well as the policy and its renewals. The letter recited also that a check in the full amount of all premiums paid for all three years was enclosed.[5]

## Discussion

### Alleged Misrepresentations and Nondisclosures

#### Nondisclosure of the Gomez and Bourodimos Incidents

Chicago first seeks to void the policy, including the 1997–98 renewal, which is the coverage pertinent to the *Gomez* and *Bourodimos* lawsuits, based on Halcond's negative response in the renewal application to the question about incidents that might give rise to claims.

▆▆▆▆ An insurer is entitled to void *ab initio* any policy, the issuance of which was induced by the insured's material misrepresentation of a past or present fact.[6] In general, even innocent misrepresentations will lead to rescission provided they are material.[7] In some cases, however, the carrier's question to the prospective insured calls for the applicant's opinion or otherwise evokes his or her state of mind. In those circumstances, the applicant's response cannot be said to be a misrepresentation unless the applicant has not truthfully portrayed his or her mental state.

The most familiar application of this principle is in cases in which carriers seek to avoid life or health insurance policies on the ground that the insured has responded to an application question by stating that the applicant is in good health, but subsequent investigation by the carrier uncovers facts suggesting that the applicant's stated view was inaccurate. The well established New York rule is that a policy may not be avoided in such circumstances if the insured "in good faith believed and was justified in believing that his health was not impaired by any condition which would ordinarily be regarded as a 'disease'" because the 'good health' representation of such an applicant is an accurate portrayal of the applicant's opinion.[8]

▆▆ The question posed by Chicago to Halcond, although framed in relatively objective terms, nevertheless included a subjective element. While the facts or circumstances concerning which it inquired were purely objective matters, the assessment it sought—whether any of those facts or circumstances "might" lead to a claim or suit—required a subjective assessment. It called upon Halcond to review his experiences for the prior year and make a judgment as to whether anything in his professional life during the relevant period could result in litigation, a judgment that necessarily required consideration of the nature and outcomes of the cases in which he was involved, his own actions, his perception of the satisfaction or lack thereof of patients and their families, and the probability of litigation, even litigation believed to be baseless. This view is sup-

---

4. Halcond Aff.Ex. D.

5. *Id.* Ex. E.

6. *E.g., Tennenbaum v. Ins. Corp. of Ireland, Ltd.,* 179 A.D.2d 589, 592, 579 N.Y.S.2d 351, 352 (1st Dept.1992); *see Jackson v. Travelers Ins. Co.,* 113 F.3d 367, 370 (2d Cir.1997); N.Y.Ins.L. § 3105 (McKinney 1985).

7. *E.g., Tennenbaum,* 179 A.D.2d at 592, 579 N.Y.S.2d at 352.

8. *E.g., Berkshire Life Ins. Co. v. Owens,* 910 F.Supp. 132, 134 (S.D.N.Y.1996) (citing *Bronx Savings Bank v. Weigandt,* 1 N.Y.2d 545, 549, 154 N.Y.S.2d 878, 881, 136 N.E.2d 848 (1956)).

ported by the Eighth Circuit's decision in *Citizens Bank of Jonesboro, Arkansas v. Western Employers Insurance Co.*[9] which reached precisely this conclusion (under Arkansas law) with respect to an application question almost identical to that at issue here. In consequence, this Court concludes that this policy may not be avoided on the ground that Halcond made a material misrepresentation in response to this inquiry if Halcond justifiably believed that his answer to the application question was accurate. In view of Halcond's affidavit that he in fact did not believe that any claim or suit was in prospect, which must be taken as true for purposes of this motion, Chicago can prevail on this aspect of the motion only if it has established the absence of any genuine issue of fact as to the lack of justification for Halcond's belief.

The fact that the results in the *Gomez* and *Bourodimos* cases were as catastrophic as they were supports Chicago's position. But that is the sole basis for Chicago's assertion that Halcond would have been unjustified in believing that litigation was not a possibility. And it is difficult to say with the requisite degree of certainty that other considerations did not justify Halcond's professed state of mind. Halcond, for example, had been practicing for 27 years at the time he signed the application without ever having been sued.[10] There may well have been other cata-

strophic results that did not result in litigation, certainly a circumstance that would bear on the reasonableness of Halcond's view. Nor was there any threat of suit on behalf of these patients prior to service of process.[11]

Chicago nonetheless contends that the cases support the view that it is entitled to summary judgment here. It relies most heavily on *Evanston Insurance Co. v. Security Assurance Co.*,[12] which it cites for the proposition that an application question such as this involves "no judgmental or subjective evaluation" by the applicant.[13] But while the case does contain some broad language consistent with Chicago's position, the facts that the applicant there did not disclose were explicit threats of litigation.[14] Hence, the holding of the case is that an insured that fails to disclose explicit threats of litigation in response to an application question such as this cannot save the policy by contending that the insured subjectively did not believe that the threats would mature into litigation. Such a belief is unjustified. To the extent the *Evanston* court wrote in terms broader than necessary to decide the case before it, this Court respectfully declines to follow it.

Here there are no circumstances comparable to those in *Evanston* or the other cases relied upon by Chicago.[15] Accord-

---

9. 865 F.2d 964 (8th Cir.1989).

10. Halcond Aff. ¶ 5.

11. *Id.*

12. 715 F.Supp. 1405 (N.D.Ill.1989).

13. Pl.Mem. 4.

14. 715 F.Supp. at 1407–09, 1414.

15. The other cases relied upon by Chicago are distinguishable on very much the same lines. In *Ratcliffe v. Int'l Surplus Lines Ins. Co.*, 194 Ill.App.3d 18, 141 Ill.Dec. 6, 550 N.E.2d 1052 (1990), the insured failed to disclose an ongoing dispute with a construction contractor in response to question identical to that at

issue here. In *Mt. Airy Ins. Co. v. Thomas*, 954 F.Supp. 1073 (W.D.Pa.1997), *aff'd*, 149 F.3d 1165 (3d Cir.1998), the attorney-insured had suffered the dismissal of a client's case for failure to prosecute before telling his carrier that he was not "aware of any claim, incident or omission ... which might reasonably be expected to be the basis of a claim or suit ...". And in *Old Republic Ins. Co. v. Landauer Assoc.*, No. 88 Civ. 434(JMC), 1989 U.S.Dist. LEXIS 13422 (S.D.N.Y. Nov. 9, 1989), a case decided after trial, the applicant failed to disclose an existing investigation of its affairs by the Federal Savings and Loan Insurance Corporation despite the fact that its board had been advised that the insured "probably" would be named in a FSLIC lawsuit. In each case, the facts known to the insured indicated such a high likelihood of

ingly, the Court concludes that plaintiff has failed to show the absence of a genuine issue of material fact as to Halcond's alleged lack of a justified belief that there were no facts or circumstances that might give rise to a claim or suit.

*Halcond's CRNA Status*

Chicago next seeks to void the policy on the ground that Halcond represented that he was a CRNA when, it is undisputed, his certification had expired in 1988.

Section 3105 of the New York Insurance Law [16] provides in pertinent part that "[n]o misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless such misrepresentation was material. No misrepresentation shall be deemed material unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make such contract." [17] Hence, it is Chicago's burden here to demonstrate that there is no genuine issue for trial as to the proposition that it would have rejected Halcond's policy application had it known that his certification had expired.

■ Chicago offers in support of the assertion that it would not have underwritten the policy had it known that Halcond's certification had expired the affidavit of one of its underwriters, Mark Fintel, who states that Chicago eventually learned that "HALCOND was not properly licensed to practice as a CRNA in New York State at the time he submitted" his applications and that it would not have issued its policies had it "been aware of the fact that HALCOND was not properly licensed to practice as a CRNA ..." [18] But the evidence supporting the assertion that Halcond was not "properly licensed"—as distinguished from his certification as a

CRNA having expired—is entirely inconclusive. Indeed, it appears that Chicago is operating on a mistaken premise.

The unauthorized practice of a profession in New York is a class E felony. [19] Nursing is a profession, and a license is required to practice it. [20] But there is no suggestion in the statutes that the role of nurse-anesthetist is a distinct profession or requires a distinct license. To the contrary, the practice of nursing as a registered professional nurse is defined in relevant part as "executing medical regimens prescribed by a licensed physician ..." [21] In consequence, as far as the Court has been able to discern, the administration of anesthesia as prescribed by a licensed physician is within the lawful scope of the activities of a registered professional nurse, whatever the actual practice or preferred standards may be in the medical community.

The basis for Chicago's contention that Halcond was not properly licensed has nothing to do with whether he was a registered professional nurse, which appears to be undisputed. It depends instead on the suggestion that only certified registered nurse anesthetists are "licensed" to practice as nurse-anesthetists. But the evidence upon which it relies does not support this proposition.

Chicago relies upon the affidavit of Kathleen M. Fuller, who is executive secretary of the New York State Association of Nurse Anesthetists as well as graduate director of the Albany Medical College Nurse Anesthesiology Program. She asserts that the New York Hospital Code sets forth the certification requirements for CRNAs, [22] which is not entirely accurate, as the cited provision simply defines

litigation as to render any contrary belief unjustified.

**16.** N.Y.Ins.L. § 3105 (McKinney 1985).

**17.** *Id.* § 3105(b).

**18.** Fintel Aff. ¶ 14.

**19.** N.Y.Educ.L. § 6512 (McKinney 1985).

**20.** *Id.* §§ 6501, 6903.

**21.** *Id.* § 6902, subd. 1.

**22.** Fuller Aff. ¶ 4.

the terms "certified registered nurse anesthetist," "registered nurse anesthetist," and "nurse anesthetist." [23] She then goes on to make the entirely unsupported assertion that "[a] CRNA who is not certified or recertified in accordance with the statute discussed above [i.e., the regulation defining the term 'certified registered nurse anesthetist'], is not properly licensed to practice nurse-anesthesiology within the State of New York, and therefore may not legally do so." [24]

We have shown already that there appears to be nothing in the New York statutes that supports Ms. Fuller's sweeping assertion. Nor has the Court found anything in the Hospital Code, the administrative regulation containing the definition to which she points. A computer search of the entire Official Compilation of Codes, Rules and Regulations of the State of New York in fact reveals that term "certified registered nurse anesthetist" appears only once apart from its presence in the section defining the term. Section 755.4 of the Hospital Code [25] provides in part that an "operator shall insure that ... anesthesia is administered by only a qualified anesthesiologist, or a physician or dentist qualified to administer anesthesia, or a certified registered nurse anesthetist ..." [26] But the section is in a portion of the Code that governs only ambulatory surgery service, which is defined to mean "surgical procedures which need to be performed for safety reasons in an operating room on anesthetized patients requiring a stay of less than 24 hours' duration" and specifically excludes "procedures which can be performed safely in a private physician's office or an outpatient treatment room." Moreover, whatever the scope of Section 755.4, it establishes only the obligations of the operator of an ambulatory surgery service. It does not bear on the scope of services that a registered professional nurse is licensed to perform.

Chicago perhaps can demonstrate that it would not have issued this policy if it had known that Halcond's certification as a CRNA had expired years before. But the proof now before this Court does not do so. It is based entirely on the premise that Halcond was not licensed to administer anesthesia, even under the direct supervision of a licensed physician. That premise is not supported by competent evidence and is at odds with the Court's reading of the pertinent statutes and regulations. In consequence, Chicago's motion for summary judgment must be denied insofar as it rests on this ground.

*The Scope of the Policy*

Chicago next contends that it is entitled to summary judgment on the ground that the *Gomez* and *Bourodimos* suits are not within the policy's insuring clause and, in any case, are excluded.

*The Insuring Clause*

The insuring clause of the policy provides in relevant part that:

"The company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages for Claims first made against the Insured and reported to the Company during the Policy Period, as a result of Bodily Injury, Property Damage or Personal Injury caused by an Incident, provided always that ..."

"2.  No Insured knew or could have reasonably foreseen that such Incident might be expected to be the basis of a Claim or Suit on the effective date of this policy or the first claims-made policy issued by the Company to which this policy is a renewal, whichever is earlier."

Chicago contends that the Gomez and Bourodimos claims are outside the scope of

23.  10 N.Y.C.R.R. § 700.2(b)(22).

24.  Fuller Aff. ¶ 6.

25.  10 N.Y.C.R.R. § 755.4.

26.  *Id.* § 755.4(c).

the insuring clause because they come within clause 2.

■ Chicago rightly points out that coverage limitations of this sort enable the insurer "to protect itself against the professional who, recognizing his past error or omission, rushes to purchase a 'claims made' policy before the error is discovered and a claim asserted against him." [27] Moreover, the Court agrees with the statement in *Coregis Insurance Co. v. McCollum*,[28] also relied upon by Chicago, that the exclusion comprehended in this insuring clause does not "require that such claim have merit or that the insured reasonably believed it to have merit." [29] But that is not to say that Chicago has established the absence of a genuine issue of fact as to whether Halcond "knew or could have reasonably foreseen that [the Gomez or Bourodimos] Incident might be expected to be the basis of a Claim or Suit" at the relevant time.

Certainly if Halcond's affidavit is believed, as it must be on this motion, we are not dealing with one who ran out to buy claims-made insurance upon recognizing a "past error or omission" or who thought a claim probable, albeit unfounded. Rather, we are dealing with a situation, viewed in the light most favorable to the party resisting the motion for summary judgment, in which the applicant allegedly did not and, based on his knowledge and experience, reasonably could not have foreseen a claim. The question whether a claim reasonably could have been foreseen simply cannot be decided on the present motion.

*The Exclusion*

Chicago next relies on Exclusion L to the policy, which states that the policy does not apply to claims arising out of the practice of the insured's profession "unless the insured is properly licensed or certified by the laws of the state(s) in which the insured practices ..." For the reasons set forth above, Chicago certainly has not established that Halcond was not properly licensed or certified as required by New York law.

*Notice*

The notice provision of the policy provides in relevant part that it is a condition of coverage that:

"Upon the Insured becoming aware of any Incident which could reasonably be expected to be the basis of a Claim covered hereby, written notice shall be given by the Insured to the Company together with fullest information obtainable. If Claim is made or Suit is brought against the Insured, the Insured shall as soon as practicable forward to the Company every demand, notice, summons or other process received by the Insured or the Insured's representative."

Chicago maintains that it has no obligations with respect to the *Gomez* and *Bourodimos* cases because Halcond failed to give prompt written notice of the incidents and then delayed too long after receiving the pleadings in those cases before sending them to the carrier.

The first of these contentions is easily disposed of. As there is a triable issue of fact with respect to whether Halcond was aware, prior to the commencement of the suits, of any incident which reasonably could have been expected to result in a claim, there is a triable issue as to whether he had any obligation to give notice of the incidents—even putting aside that the policy did not require the giving of notice of an incident, as opposed to a claim or suit, within any particular time period.

■ The question of the timeliness of Halcond's forwarding of the litigation papers is more troublesome. As noted above, Halcond was served in *Gomez* on December 22, 1997 and in *Bourodimos* on

---

27.  Pl.Mem. 12 (quoting *Zuckerman v. Nat'l Union Fire Ins. Co.*, 100 N.J. 304, 495 A.2d 395 (1985)).

28.  961 F.Supp. 1572 (M.D.Fla.1997).

29.  *Id.* at 1579.

January 21, 1998. It is undisputed that his alleged telephonic notice was insufficient to discharge his obligations to give written notice of the incidents (which by then had resulted in claims) and to forward the papers. And Halcond's affidavit reveals no effort to forward the summonses and complaints to the carrier until March 1998.[30] Viewing the evidence in the light most favorable to Halcond, the Court therefore must assume that he mailed those documents on March 1, 1998. In consequence, it is undisputed that no written notice was given and that the pleadings were not forwarded to the carrier until at least 68 days after Halcond was served in *Gomez* and 38 days after he was served in *Bourodimos*.

■ Policy provisions requiring notice "as soon as practicable" or in comparable terms generally are construed to require notice within a reasonable time after the duty to give notice arises.[31] The burden of showing that any delay is reasonable lies with the insured.[32]

Here the only excuse Halcond offers for the delay is his alleged good faith belief that nothing had occurred in the Gomez and Bourodimos incidents that might give rise to a claim. It may be assumed that this contention raises an issue of fact with respect to his obligation to notify the carrier of those incidents. But once he was served with process, his obligation was unequivocal—he was required, whether he thought the lawsuits valid or not—to forward the pleadings "as soon as practicable." [33] As Halcond has not given any reason for his failure to forward the documents earlier than the first of March 1998, the question is whether unexplained delays of 68 and 38 days satisfied the policy requirement of notice "as soon as practicable." The answer is reasonably plain.

■ In *Myers v. Cigna Property & Casualty Insurance Co.,*[34] Judge Patterson granted a carrier's motion for summary judgment on the basis that an unexplained delay of 60 days did not constitute notice "as soon as possible" as required by the policy.[35] In *Republic New York Corp. v. American Home Assurance Co.,*[36] the Appellate Division reached the same result in a case involving a 45 day delay. And in *Pandora Industries, Inc. v. St. Paul Surplus Lines Insurance Co.,*[37] the First Department held that a 31 day delay failed to satisfy the policy condition. In consequence, Halcond is barred from recovery on the policy with respect to, and is not entitled to a defense in, the Gomez and Bourodimos cases.[38]

**30.** Halcond Aff. ¶ 6.

**31.** *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.,* 979 F.2d 268, 275 (2d Cir.1992); *Matter of Arbitration between Travelers Ins. Co. and Delosh,* 249 A.D.2d 924, 672 N.Y.S.2d 219, 220 (4th Dept.1998).

**32.** *E.g., Amer. Ins. Co. v. Fairchild Indus., Inc.,* 56 F.3d 435, 438 (2d Cir.1995); *Mount Vernon Fire Ins. Co. v. Creative Housing Ltd.,* 797 F.Supp. 176 (E.D.N.Y.1992); *Matter of Travelers Ins. Co.,* 249 A.D.2d at 924, 672 N.Y.S.2d at 220.

**33.** *See, e.g., State of New York v. Blank,* 27 F.3d 783, 795–96 (2d Cir.1994) (distinguishing between obligation to give notice of occurrence and obligation to give notice of claim).

**34.** 953 F.Supp. 551 (S.D.N.Y.1997).

**35.** *Id.* 556–57.

**36.** 125 A.D.2d 247, 509 N.Y.S.2d 339 (1st Dept.1986).

**37.** 188 A.D.2d 277, 590 N.Y.S.2d 471 (1st Dept.1992), *lv. denied,* 81 N.Y.2d 973, 598 N.Y.S.2d 775 (1993).

**38.** Halcond contends that Chicago is estopped by its renewal of the policy for 1998–99 and its acceptance of premiums, both after its receipt of notice of the *Gomez* and *Bourodimos* suits, and its failure promptly to rescind the 1998–99 renewal after receiving notice that Halcond's expired CRNA status to deny coverage. These points are relevant and perhaps material to Chicago's effort to rescind the policy and the 1997–98 renewal, during the term of which the *Gomez* and *Bourodimos* suits were brought, because they arguably bear on the materiality of the information allegedly misrepresented or withheld by Halcond in applying for the policy and the renewals. But they are not sufficient in law to

*Conclusion*

As noted at the outset, Chicago seeks both to void the policy and the renewals and, in any event, a declaration that it is not obliged to defend and indemnify Halcond with respect to the *Gomez* and *Bourodimos* cases. There are genuine issues of material fact as to the prayer for a declaration that the policy and the renewals are void and may be rescinded by reason of Halcond's alleged material misrepresentations. Chicago, however, is entitled to prevail with respect to the duties to defend and indemnify in the two underlying cases. Accordingly, plaintiff's motion for summary judgment is granted to the extent that the Court declares that it is not obliged to defend or indemnify Halcond with respect to the *Gomez* and *Bourodimos* cases. It is denied in all other respects.

While *Gomez* and *Bourodimos* appear to have been the only claims made during the term of the original policy and the 1997–98 renewal, the plaintiff's effort to void the policy for material misrepresentations is not moot because the *Stewart* claim was made during a subsequent renewal, and the voiding of the original policy arguably would void the 1998–99 renewal. What remains of the case therefore will be tried commencing on June 1, 1999 at 9:30 a.m.

SO ORDERED.

preclude Chicago's reliance on Halcond's failure to give timely notice of the *Gomez* and *Bourodimos* suits. There is no suggestion that Chicago's disclaimer with respect to those suits was belated, much less that Halcond relied to his detriment on Chicago's failure to disclaim more promptly. *See, e.g., Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 294 (2d Cir.1999).